**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT WILLIAMS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1110-CR-553 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Lisa Borges, Judge
Cause No. 49G04-1003-MR-23231

**June 26, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Robert Williams appeals his conviction and sentence for murder. We affirm.

**Issues**

The issues before us are:

I. whether the trial court properly allowed the State to introduce a witness's deposition into evidence in lieu of her live testimony;

II. whether there is sufficient evidence to support Williams's conviction; and

III. whether his ninety-five-year sentence is inappropriate.

**Facts**

On the morning of September 19, 2009, teacher Sandra Bartenbach failed to show up at the elementary school in Indianapolis where she worked. An assistant to the school principal, Kimberly Brown, went to Bartenbach's house to determine why she was not at school. Upon arriving at the house, Brown noticed that the front door was ajar and the rear sliding door also was open. Brown then decided to call 911. A police officer arrived on the scene and went into the house, where he discovered Bartenbach's lifeless body in a pool of blood in a bathroom. Bartenbach had been stabbed approximately twenty-five times.

Williams lived across the street from Bartenbach with his girlfriend, Sandra Emous, and Emous's parents. On September 20, 2009, police went to Emous's house after Williams became a person of interest in the investigation. Emous told a detective

that Williams had gone with a cousin to Fort Wayne on the afternoon of September 19. Emous also told the detective that she was aware of Williams having been in Bartenbach's house only once, about a year and a half before, when he helped Bartenbach move a dresser into the house. Bartenbach's ex-husband confirmed that Williams had helped move furniture on that occasion. Williams submitted to an interview by police on September 21, 2009, in which he stated that he had been in the house on a few other occasions as well, in response to police questioning that falsely implied that his fingerprints had been found throughout the house.

Emous and Williams also told police that on the evening of September 18, 2009, they had stayed at home, except for going to a Meijer store at around 8:00 p.m. for approximately one hour. Ten months after this original statement, Emous told police that they also had gone to a Walmart store at about 1:00 a.m. on September 19, 2009. Records of a cell phone belonging to Emous, however, showed that the phone had been used during the evening of September 18th and early morning hours of September 19th at locations other than Emous's house, the Meijer store, or the Walmart store.

David Lucas of the Indianapolis-Marion County Crime Lab ("Crime Lab") swabbed various areas of Bartenbach's house where there appeared to be blood stains, as well as other areas where DNA from skin cells might be expected to be found. Included among the items that Lucas swabbed was the inside and outside of the front door doorknob, which he determined had blood on it. The entire doorknob itself was removed

and taken to the Crime Lab. Lucas also attempted to lift fingerprints in various areas of the house, but no fingerprints matching Williams were recovered.

Judith Macechko, a serologist with the Crime Lab, examined most of the items or swabs that Lucas had collected to confirm whether any of them contained human blood or seminal material. She did not, however, test the front door doorknob for human blood because Lucas had already collected blood samples from it. Any items that she confirmed were blood were marked for further DNA testing; she found no seminal material. She also swabbed the front doorknob for possible skin cell samples, which were marked for further DNA testing. Tonya Fishburn with the Crime Lab completed the DNA testing on the items submitted by Lucas and Macechko. Fishburn determined that blood from the front door doorknob collected by Lucas was Williams's, based on the DNA profile. Williams's DNA was not found in samples from other locations in the house.

On March 23, 2010, Williams was charged with the murder of Bartenbach, as well as Class A felony robbery. The State subsequently added a habitual offender allegation. Williams was already in the Marion County Jail on another charge before this date. Williams spoke with Emous on the phone several times, and they were recorded discussing whether Williams's DNA might be found in Bartenbach's house. Emous did some research on forensic DNA testing and told Williams that DNA could be left at a scene by sweating. Williams responded, "Nah I wasn't, wasn't none of that, ain't none of that going on." Ex. 195, 195(a).

4

Williams also told Emous what she should say to police, including "Just be like 'He was home with me he did not go nowhere. And he was at home with me and my family was home.'" Ex. 196, 196(a). When Emous told Williams that police wanted to question her mother, Williams told Emous that she needed to "lace mama up . . . ." Ex. 198, 198(a). Eventually, Williams was forbidden from speaking with Emous on the phone. Williams then enlisted a fellow inmate to make calls to Emous and pass along coded messages to her. The inmate believed the messages were intended to emphasize to Emous that she be consistent in her statements to police. Also, after it was revealed that Williams's DNA was found in a blood stain at Bartenbach's house, Emous told investigators for the first time that she recalled Williams having helped Bartenbach unload groceries at her house two days before the murder and that he had accidentally cut himself while doing so, causing his knee to bleed.

On April 4, 2011, the State filed a request that a video deposition of Macechko be scheduled to be used at trial in place of her live testimony. Specifically, the State asserted that Macechko would be unavailable to testify at trial because she had retired from the Crime Lab and moved to Cleveland, Ohio, to care for her gravely ill elderly mother. Williams objected to the request for a video deposition in lieu of Macechko's trial testimony. The trial court overruled this objection. On June 23, 2011, a deposition of Macechko was conducted using the internet video communication system known as Skype. Macechko was located in Cleveland along with a Marion County deputy prosecutor, a Cuyahoga County, Ohio, deputy prosecutor, and the lead police detective.

5

Located in a courtroom in Indianapolis were the trial judge, Williams, his attorney, another deputy prosecutor, and IT personnel.

Williams's jury trial was held on September 6-12, 2011. Williams objected to the State's use of Macechko's Skype deposition in lieu of her live testimony, and the trial court overruled the objection. The jury found Williams guilty of murder but not guilty of robbery and also found that he is a habitual offender. The trial court sentenced Williams to a term of sixty-five years for murder, enhanced by thirty years for the habitual offender finding, for a total sentence of ninety-five years executed. Williams now appeals.

**Analysis**

*I. Macechko's Deposition*

Williams first raises a number of challenges to the use of Macechko's Skype deposition at trial in lieu of her live testimony. His arguments are a combination of evidentiary hearsay and constitutional concerns. Specifically, he claims the State failed to prove that Macechko was "unavailable" to testify at trial, which is a requirement of both the Sixth Amendment to the United States Constitution and Indiana Evidence Rule 804 before a deposition may be used at trial in lieu of live testimony. Additionally, Williams contends that even if Macechko was "unavailable," the use of Skype to conduct her deposition violated his right under Article 1, Section 13(a) of the Indiana Constitution to confront any witnesses against him "face to face."

Rulings on the admission of evidence, including hearsay evidence, are within the sound discretion of the trial court, and we review the court's decision only for an abuse of

6

discretion. State v. Chavez, 956 N.E.2d 709, 712 (Ind. Ct. App. 2011). "An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the trial court." Id. We may affirm the trial court's ruling on any basis supported by the record. Id.

We first note the State's argument that Macechko's deposition did not even constitute hearsay because it was conducted in the presence of the trial judge and thus was an "in-court" statement. It is true that many cases refer in shorthand to hearsay as "an out-of-court statement offered to prove the truth of the matter asserted." Garner v. State, 777 N.E.2d 721, 724 (Ind. 2002). However, the actual definition of hearsay is that is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Macechko's deposition clearly was a statement or statements she made "other than . . . while testifying at [Williams's] trial . . . ." Id. "Generally, deposition testimony of an absent witness offered in court to prove the truth of the matter asserted constitutes classic hearsay." Garner, 777 N.E.2d at 724. The fact that the trial judge personally witnessed the deposition while it occurred, and that the judge, Williams, and his attorney were physically present in a courtroom at the time, does not mean the deposition was not hearsay when the State sought to introduce it into evidence later at Williams's trial.

Under the Sixth Amendment, out-of-court testimonial statements by a witness who does not appear at trial are inadmissible unless the witness is unavailable to testify and

7

the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365 (2004). Also, Indiana Evidence Rule 804(b)(1) classifies a deposition as admissible hearsay if the deponent is unavailable to testify as a witness at trial. Evidence Rule 804(a) provides that a witness is unavailable if he or she:

> (1)    is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or
>
> (2)    persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or
>
> (3)    testifies to a lack of memory of the subject matter of the declarant's statement; or
>
> (4)    is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
>
> (5)    is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process or other reasonable means.[1]

When the State wishes to use a hearsay statement against a defendant, it bears the burden of demonstrating the declarant's unavailability to testify at trial. Garner, 777 N.E.2d at 724. In particular, the State must make a good faith effort to obtain a witness's

---

[1] Indiana Trial Rule 32(A)(3)(b) also states that a deposition "may be used by any party for any purpose if . . . the witness is outside the state, unless it appears that the absence of the witness was procured by the party offering the deposition . . . ." Our supreme court, however, has held that this provision is inapplicable in cases involving a criminal defendant's right of confrontation. Jackson v. State, 735 N.E.2d 1146, 1151 (Ind. 2000).

attendance at trial, regardless of whether he or she is out-of-state at the time of trial. Id. "Even if there is only a remote possibility that an affirmative measure might produce the declarant at trial, the good faith obligation may demand effectuation." Id. at 724-25. "Reasonableness is the test that limits the extent of alternatives the State must exhaust." Id. at 725.

We believe that this circumstance pushes to the very edge of the envelope as to whether Macechko truly was unavailable to testify at Williams's trial. Our supreme court has found witnesses should have been deemed available to testify, even where it would have been highly inconvenient for the witness. See Jackson v. State, 735 N.E.2d 1146, 1152 (Ind. 2000) (holding witness was not unavailable to testify where he was in Washington, D.C. undergoing Secret Service training and attending trial would have caused witness to fall behind in training requirements). As noted by Williams, it was not Macechko's own physical or mental infirmity that caused her to not be at the trial. Also, although the State offered to fly Macechko and her mother to Indianapolis, along with a nurse to assist in her mother's care,[2] Williams argues that there was no indication it explored the possibility or feasibility of Macechko traveling alone to Indianapolis and having a nurse of some kind care for her mother in Cleveland during that time. We also note that the determination of Macechko's unavailability for trial apparently was made as of no later than June 23, 2011, but Williams's trial did not take place until nearly two-and-a-half months later, at the beginning of September. There is no indication in the

---

[2] Macechko stated that her mother was too ill to travel.

9

record of whether the condition of Macechko's mother improved, worsened, or stayed the same in that time period, or whether Macechko was continuing to provide home-based nursing care to her mother entirely on her own at the time of trial.

We also understand that in this technological age, "confrontation" at some point may take on a meaning that none of us has yet imagined or realized. Despite advances in communication technology, a defendant's right to a fair trial with all its attendant Constitutional guarantees is our legal and moral obligation to uphold.

We conclude, nevertheless, that even if the State failed to establish that Macechko was unavailable for trial and that her deposition was improperly admitted into evidence, any such error would have been harmless. Violation of a criminal defendant's Sixth Amendment confrontation rights does not require reversal if it can be shown beyond a reasonable doubt that the error did not contribute to the verdict. Koenig v. State, 933 N.E.2d 1271, 1273 (Ind. 2010).

Possibly the most critical single piece of evidence against Williams was that a blood stain recovered from the front door doorknob of Bartenbach's house was from Williams, based on the DNA profile. It was Lucas who first noticed that stain, removed the doorknob from the door, and swabbed it for blood at the Crime Lab, and it was Fishburn who conducted the final DNA testing. Macechko's involvement in the handling of this item of evidence was slight. As indicated in her deposition testimony, at most, Macechko handled the doorknob during the course of the testing process and was involved in the chain of custody of the blood stain swabbed from it, but no more.

Although the State bears a higher burden to establish the chain of custody of "fungible" evidence, including blood samples, the State need not establish a perfect chain of custody. Troxell v. State, 778 N.E.2d 811, 814 (Ind. 2002). The State need only give reasonable assurances that the evidence remained in an undisturbed condition. Id. "Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties." Id. In particular, the State need not present the testimony of every technician who handled a particular piece of evidence in order to establish an adequate chain of custody. See Kennedy v. State, 578 N.E.2d 633, 638-39 (Ind. 1991), cert. denied.

Here, we are convinced the State could have laid an adequate chain of custody foundation for the introduction of Fishburn's testing results, finding Williams's DNA in a blood stain on Bartenbach's front door doorknob, based upon Fishburn's and Lucas's testimony. Macechko did not participate in either the original collection of this evidence, the determination that it should be subjected to DNA testing, or the ultimate DNA testing itself. We conclude that even if it was error to introduce Macechko's deposition into evidence, and we do not specifically decide that question, any such error was harmless beyond a reasonable doubt.

## II. Sufficiency of the Evidence

Next, Williams challenges the sufficiency of the evidence supporting his conviction. We neither reweigh evidence nor judge witness credibility when assessing the sufficiency of the evidence supporting a conviction. Bailey v. State, 907 N.E.2d

1003, 1005 (Ind. 2009). We will consider only the evidence supporting the judgment and any reasonable inferences flowing from that evidence. Id. "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." Id.

Williams argues that the entirely circumstantial case against him, including the DNA placing him at Bartenbach's house, was insufficient to prove he killed Bartenbach. See Hampton v. State, 961 N.E.2d 480, 494 (Ind. 2012) (characterizing presence of defendant's DNA at crime scene and on victim as circumstantial evidence that defendant raped and murdered victim). When a conviction is based solely upon circumstantial evidence, the question before this court is whether reasonable minds could have reached the inferences drawn by the jury; if so, there is sufficient evidence to support the conviction. Klaff v. State, 884 N.E.2d 272, 274-75 (Ind. Ct. App. 2008). We need not determine whether the circumstantial evidence is sufficient to overcome every reasonable hypothesis of innocence, but only whether inferences may reasonably be drawn from that evidence to support a guilty verdict beyond a reasonable doubt. Id. at 275. Additionally, although one's mere presence at a crime scene along with an opportunity to commit a crime will not be sufficient to support a conviction, such evidence in connection with other circumstances tending to show one's participation in the crime may raise a reasonable inference of guilt. Id.

Here, not only was Williams's DNA found at Bartenbach's house, but it was found in a blood stain. This would be consistent with having used a knife or other sharp

object to repeatedly stab another person and accidentally cutting oneself in the process. Moreover, Williams's and Emous's varying explanations for how Williams's blood came to be at Bartenbach's house are puzzling. It is undisputed and verified by an independent witness that Williams was in Bartenbach's house on at least one prior occasion about a year-and-a-half before the murder. In the immediate aftermath of the murder, this was the only occasion that Emous remembered Williams ever being at Bartenbach's house. However, after it was revealed that Williams's blood was found at Bartenbach's house, Emous recalled Williams having been in Bartenbach's house just days before the murder, and having cut himself and possibly bled while there. Emous had previously failed to mention this purported incident. Additionally, in his interview with police Williams seemed to give varying explanations of how many times he had been in Bartenbach's house, and where he had been in the house, when confronted with the (admittedly false) insinuation by police that his fingerprints were found in the house.

There also is evidence Emous attempted to provide a false alibi for Williams, testifying that he and she were both at home the entire evening before Bartenbach's body was found, except for having gone to a Meijer around 8:00 p.m. and a Walmart around 1 a.m. Again, however, Emous failed to mention the 1:00 a.m. Walmart trip when originally speaking to police. Additionally, cell phone records for Emous's phone contradict her assertion that she and Williams were both at home all evening of September 18, 2009, except for the times at the stores. It also is apparent that Williams was directly involved in advising Emous to concoct such an alibi, as revealed in the

13

recorded phone conversations. He specifically told Emous to say, "'He was home with me he did not go nowhere. And he was at home with me and my family was home.'" Ex. 196, 196(a). After Williams was forbidden from speaking on the phone with Emous, he used a fellow inmate to pass along coded messages to her, pressuring her to remain consistent in her statements to police. Attempts to fabricate an alibi may be considered evidence of consciousness of guilt on the part of the accused. McKinstry v. State, 660 N.E.2d 1052, 1053 (Ind. Ct. App. 1996).

The recorded phone conversations also reveal Emous's and Williams's concern that his DNA would be found at Bartenbach's house. Williams even came very close to admitting his direct involvement in the murder when he said, "Nah I wasn't, wasn't none of that, ain't none of that going on," in response to Emous telling him that DNA could be contained in sweat. Ex. 195, 195(a). Finally, aside from advising Emous what to tell police, he also told her to "lace mamma up," i.e. Emous's mother, when he was told that police wanted to question her as well. Ex. 198, 198(a). A reasonable inference from such a statement is that Williams wanted Emous's mother to say nothing, or nothing that might implicate him or contradict what Emous and Williams had already told police.

In sum, Williams is requesting that this court draw inferences from the circumstantial evidence in his favor: that his DNA at the scene was consistent with his admittedly having been at the house previously, that the phone calls between him and Emous or Emous and the other inmate were "fishy" but could equally be construed as attempts to marshal evidence in his defense, and that the cell phone records were

14

"probative of no element of this offense." Appellant's Br. pp. 18-19. It was up to the jury, however, to determine how to weigh this evidence and which inferences to make from it. Given the circumstantial evidence of Williams's guilt, there is sufficient evidence to support his conviction.

### III. Sentence

Finally, we address Williams's argument that his ninety-five-year sentence is inappropriate in light of the nature of the offense and his character, pursuant to Indiana Appellate Rule 7(B). Although Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, we still must give due consideration to that decision. Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. Id. "Additionally, a defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." Id.

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." Id. Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given

case. Id. at 1224. When reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended. Davidson v. State, 926 N.E.2d 1023, 1025 (Ind. 2010).

Regarding the nature of the offense, this was a brutally violent and senseless killing with no apparent motive of any kind. All murders are, of course, senseless and violent to some degree. There is a factor here, however, that makes this crime especially heinous, and that is the impact this crime had beyond members of Bartenbach's immediate family. As was indicated at the sentencing hearing, a number of young children were faced with the shock of their teacher not showing up to school one day, only to learn later that she had been killed. The impact of Bartenbach's death on a number of young children makes this offense especially heinous.

Turning to Williams's character, he was first adjudicated a delinquent child in 1984 for having committed burglary at the age of fourteen. He had another juvenile adjudication the next year for receiving stolen property. Beginning in 1987, he has adult criminal convictions for concealing stolen property in Oklahoma, and in Indiana for armed robbery on three different occasions, possession of cocaine or a narcotic drug, battery with injury, and two counts of driving without a license. In addition to these convictions, Williams has incurred repeated conduct violations while incarcerated in prison or jail. He also has admitted to using marijuana on a regular basis. He has had probation revoked on at least one prior occasion. In other words, Williams has engaged

16

in criminal conduct of some kind or another, frequently violent, on a nearly constant basis since 1984. He evidently has great difficulty controlling his behavior even while incarcerated. Even when considering that two of Williams's prior felony convictions are accounted for in the thirty-year habitual offender enhancement of his sentence, his remaining criminal and incorrigible behavior is extremely troubling. Additionally, although Williams directs us to a statement from Emous's mother that he is "a laid back, you know, nice person," we need not take this statement at face value, given the heinousness of the crime he committed here and his long history of criminal behavior. Tr. p. 922.

Williams's total sentence of ninety-five years executed represents the maximum he could have received for murder and a habitual offender enhancement. Although maximum sentences generally should be reserved for the "worst" offenders and offenses, this refers generally to a class of offenders and offenses that warrant maximum punishment and may encompass a considerable variety of offenders and offenses. Buchanan v. State, 767 N.E.2d 967, 973 (Ind. 2002). We conclude that Williams's character and the nature of the offense he committed fall within the class of the "worst," thus making his maximum sentence not inappropriate.

### Conclusion

Even if it was error to permit the State to introduce Macechko's deposition into evidence in lieu of her live testimony, any such error was harmless beyond a reasonable

doubt. There is sufficient evidence to support Williams's conviction, and his sentence is not inappropriate. We affirm.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.