**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DONALD R. SHULER**
Barkes Kolbus Rife & Shuler
Goshen, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SAMUEL DAVIS, JR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 57A03-1110-CR-499 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE NOBLE SUPERIOR COURT
The Honorable Robert E. Kirsch, Judge
Cause No. 57D01-1012-FB-4

**July 31, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Samuel Davis, Jr. (Davis), appeals his conviction for operating while intoxicated causing death, a Class B felony, Ind. Code § 9-30-5-5(b)(1). We affirm.

## ISSUES

Davis raises three issues on appeal, which we restate as the following four issues:

(1) Whether the admission of Davis' blood test constituted fundamental error;

(2) Whether the State presented sufficient evidence beyond a reasonable doubt to support Davis' conviction;

(3) Whether the trial court properly refused to tender Davis' proposed jury instruction on unpreserved evidence; and

(4) Whether Davis' sentence is inappropriate in light of his character and the nature of the crime.

## FACTS AND PROCEDURAL HISTORY

In March of 2010, thirty-four year old Davis and twenty-two year old Victoria Anderson (Anderson) were dating. Around 4 a.m. on March 2, 2010, Davis was driving home and Anderson was in the passenger seat. At some point, Davis' car left the roadway and ran into a tree, with the passenger side absorbing the brunt of the impact. Anderson was pronounced dead on the scene, with the cause of death being blunt force trauma from the accident.

2

Around 4:30 a.m., Kosciusko County Sheriff's Deputy Travis Shively (Officer Shively) arrived at the scene. He noticed an odor of alcohol emanating from the car and observed that Davis' eyes were bloodshot. Davis was conscious but disoriented and confused; Officer Shively did not see any sign of life from Anderson. Upon being told that he had struck a tree, Davis responded, "no, I didn't." (Transcript p. 272). Eventually, Davis was removed from the vehicle and transported by ambulance to a local hospital. When Sheriff's Deputy Brandon Hepler (Officer Hepler) entered the ambulance, he smelled a strong odor of alcohol and observed that Davis' eyes were bloodshot and watery. Certified paramedic Naomi Oleson also smelled the odor of alcohol, as well as flight nurse Cindy McDonald who accompanied Davis when he was airlifted to Parkview Hospital, in Fort Wayne, Indiana.

Officer Hepler read the implied consent law to Davis three times in the ambulance, but Davis never acknowledged that he heard advisement nor did he respond. Officer Hepler requested an EMT to draw a blood sample from Davis, which was given to Lieutenant Chris McKeand (Officer McKeand). When Officer McKeand learned of the circumstances in which the blood draw had taken place, he became concerned about the validity of the consent.[1] He dispatched Sheriff's Deputy Rick Shepherd (Officer Shepherd) to the hospital to obtain another blood sample. When Officer Shepherd spoke with Davis, he noticed the strong odor of alcohol, Davis' bloodshot eyes, and his repeated question about what had happened. Officer Shepherd read the implied consent law; Davis did not respond but instead stared at the ceiling. Officer Shepherd informed

---

[1] The blood sample obtained by Officer Hepler was never tested.

Officer McKeand about the lack of response and the Officers decided to get a search warrant.

When Davis arrived at the Parkview Hospital, emergency room physician Dr. Corbett Smith (Dr. Smith) ordered Davis' blood to be tested for alcohol, among other things, for the purpose of diagnosis and treatment. The hospital's certified phlebotomist drew Davis' blood in accordance with the hospital's protocols. The blood was transferred to the hospital's laboratory for immediate testing. Testing by the hospital's certified medical technician revealed a blood alcohol content of between .20 to .27. After the results of the test were released to law enforcement pursuant to an emergency release form, the blood sample was frozen and not further tested.

Officer Shepherd returned to the hospital with a search warrant to draw Davis' blood. Hospital laboratory assistant, Shelli Hack (Hack), drew Davis' blood following the hospital's protocols. After the blood draw, Hack handed the sample to Officer Shepherd who completed the paperwork, packaged up the sample, and sealed it. Officer Shepherd mailed the blood sample together with a urine sample that he had obtained, to the State Toxicology lab by certified mail later that same morning.

A week later, on March 9, 2010, the sample was received by the State's Toxicology lab and stored in the walk-in refrigerator. On April 29, 2010, an analyst retrieved the sample for testing, which revealed a blood alcohol content of .25. On May 12 and 18, 2010, further testing was conducted which showed the presence of marijuana and cocaine metabolites in Davis' blood.

Meanwhile, members of the Fatal Alcohol Crash Team (FACT) conducted an investigation at the scene of the accident and found that the road was dry in the early morning of March 2, 2010. FACT did not find any evidence that Davis applied his brakes on or off the roadway, nor did the team find any evidence of any other response by Davis, such as steering to correct the course of the vehicle. Following FACT's conclusions, Officer McKeand met with Davis. During the interview, Davis told the Officer that on the morning of the accident, a car was coming towards him in his lane, he applied his brakes and went off the road. After hearing this explanation, Officer McKeand returned to the place of the accident. He inspected the road but was unable to find any brake marks. Also, after obtaining a search warrant for Davis' vehicle, Officer Shepherd was unable to find any patches on the tires which would be indicative of the application of hard braking during a skid. However, it should be noted that Officer Shepherd only looked at those sections of the tires that were readily visible; he did not rotate the tires.

On March 8, 2010, the State filed an Information charging Davis with operating while intoxicated causing death, a Class B felony, I.C. § 9-30-5-5(b)(1). In May of 2010, Davis entered into a plea agreement with the State to plead guilty to a lesser included offense. This plea was rejected by the trial court for being deemed too lenient. In July of 2010, Davis again entered into a plea agreement but changed his mind at a subsequent hearing and decided to plead not guilty. On August 6, 2010, the State filed an amended Information charging Davis with Count I, causing the death of another person while operating a motor vehicle with a blood alcohol content of at least .15, a Class B felony,

5

I.C. § 9-30-5-5; Count II, causing the death of another person while operating a motor vehicle with a controlled substance, namely cocaine, a Class B felony, I.C. § 9-30-5-5; and Count III, causing the death of another person while operating a motor vehicle with a controlled substance, namely marijuana, a Class B felony, I.C. § 9-30-5-5. In December 2010, Davis entered into a third plea agreement but withdrew from that agreement as well. On September 16, 2011, the State filed a second amendment to its Information and added Count IV, operating while intoxicated, a Class C felony, I.C. § 9-30-5-5.

On October 4 through October 7, 2011 a jury trial was conducted. Prior to handing the case to the jury, Davis tendered a handwritten proposed jury instruction relating to unpreserved evidence, which the trial court declined to give. At the close of the evidence, the jury found Davis guilty on all four Counts. On October 26, 2011, a sentencing hearing was held. During the hearing, the trial court vacated the guilty verdict on Counts II through IV based on double jeopardy grounds and sentenced Davis to eighteen years incarcerated with three years suspended on Count I.

Davis now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Admission of Blood Test*

Davis contends that the trial court erroneously admitted the blood test taken by Officer Shepherd at Parkview Hospital after he had obtained a search warrant. Because Davis failed to object to its admission during trial, he waived the argument. *See Lewis v. State*, 755 N.E.2d 1116, 1122 (Ind. Ct. App. 2001) (failure to make a contemporaneous objection to the admission of evidence at trial results in waiver of the error on appeal).

6

Davis now attempts to avoid waiver by claiming that the admission of the evidence constituted fundamental error. The fundamental error exception is very narrow and is defined as an error so prejudicial to the rights of a defendant that a fair trial is rendered impossible. *Perez v. State*, 872 N.E.2d 208, 210 (Ind. Ct. App. 2007), *trans. denied*. To be considered fundamental, an error "must constitute a blatant violation of basic principles, the harm, or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Id.*

Davis' main contention on the admissibility of the blood test relates to the chain of custody. Specifically, Davis argues that while Officer Shepherd obtained a blood and urine sample at the hospital pursuant to a search warrant, no witness was present when Officer Shepherd sealed the samples, and thus, it is doubtful that the State attained a proper chain of custody.

The State bears a higher burden to establish the chain of custody of fungible evidence, such as blood and hair samples, whose appearance is indistinguishable to the naked eye. *Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002). To establish a proper chain of custody, the State must give reasonable assurances that the evidence remained in an undisturbed condition. *Id.* However, the State need not establish a perfect chain of custody and once the State "strongly suggests" the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. *Id.* Moreover, there is a presumption of regularity in the handling of evidence by officers and there is a presumption officers exercise due care in handling their duties. *Id.* To mount a

successful challenge to the chain of custody one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with. *Id*.

Here, the evidence establishes that Hack drew Davis' blood upon receipt of the search warrant; Officer Shepherd videotaped the blood draw. When Hack was finished, she handed the vials to Officer Shepherd. At trial, Hack explained that the blood tubes were vacuum sealed and automatically resealed when the needle was withdrawn from the vials so nothing could come out. Officer Shepherd then completed the paperwork, packaged up the samples, and sealed them. No witness was present during this process. Officer Shepherd took the samples to the post office and mailed them to the State's toxicology lab by certified mail. While Officer Shepherd testified that he shipped the samples immediately around 8 a.m., the post office time stamp for the certified mailing shows a mailing time of 9:49 a.m.

Approximately a week later, on March 9, 2010, the samples were received by the State's toxicology lab and placed in the refrigerator. Evidence reflects that when the lab received the blood sample, it was sealed, not coagulated, and no irregularities were noted. Trial testimony explained that the week long delay in refrigeration did not affect the quality of the blood sample as it did not need to be refrigerated, nor did the leaking urine vial pose any contamination problem for the blood sample. Further documentation identified the technicians who handled the sample, the testing they performed, and the results thereof.

While we have previously held that "it is incumbent upon the State to present evidence of the physician, nurse or someone in authority who was present at *the taking of*

8

*the blood* establishing a chain of custody of the specimen to the laboratory where the testing is conducted," we have never imposed a similar burden with respect to sealing the package containing the blood sample. *Culver v. State*, 727 N.E.2d 1062, 1068 (Ind. 2000) (emphasis added). Nor will we impose this requirement today. As the sealing of evidentiary material falls squarely within an officer's duty of handling evidence, we conclude that there is a presumption that Officer Shepherd exercised due care when sealing the package. The mere fact that the mail certification indicated 9:49 a.m. rather than the 8 a.m. as testified to by Officer Shepherd only goes to the weight of the evidence, not its admissibility. We conclude that the State presented a proper chain of custody and therefore the trial court did not err, let alone make a fundamental error, in the admission of the blood sample.

### III. *Sufficiency of the Evidence*

Next, Davis contends that the State presented insufficient evidence establishing beyond a reasonable doubt that he was guilty of operating a vehicle while intoxicated causing death, a Class B felony.

Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of the witnesses. *Perez*, 872 N.E.2d at 212-213. We will consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. *Id*. at 213. A conviction may be based upon circumstantial evidence alone. *Id*. Reversal is appropriate only when

9

reasonable persons would not be able to form inferences as to each material element of the offense. *Id.*

To convict Davis of operating while intoxicated causing death, a Class B felony, the State was required to prove that Davis, at least twenty-one years of age, caused the death of Anderson when operating a motor vehicle with an alcohol concentration equivalent to at least fifteen-hundredths (0.15) gram of alcohol per one hundred milliliters of Davis' blood. *See* I.C. § 9-30-5-5(b)(1). Davis focuses his argument on the claim that the State failed to establish the requisite blood alcohol concentration. Specifically, he contends that the facts and circumstances regarding his blood sample and testing are too unreliable to be reasonably relied upon by the jury to support his convictions.

First, we already determined above that the blood sample taken by Officer Shepherd pursuant to a search warrant was properly obtained, sealed, and preserved within the chain of custody guidelines. The testing of this blood sample indicated that Davis had a blood alcohol content of .25, well above the statutory requirement of .15. Moreover, the State presented evidence that several Officers smelled the odor of alcohol on Davis, they noticed that his eyes were bloodshot, his speech was slurred, and he was confused. Based on this evidence, the fact finder could reasonably find that the State established the statutory blood alcohol concentration beyond a reasonable doubt. Therefore, we affirm Davis' conviction.

IV. *Jury Instruction*

10

Davis argues that the trial court abused its discretion when it rejected his proposed handwritten jury instruction on destruction of evidence. It is well established by our court that instructing the jury is within the discretion of the trial court. *Perez*, 872 N.E.2d at 210. Jury instructions are to be considered as a whole and in reference to each other; error in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case. *Id*. In reviewing a challenge to a jury instruction, this court considers whether the instruction correctly states the law, whether there was evidence in the record to support the giving of the instruction, and whether the substance of the tendered instruction is covered by other instructions. *Hubbard v. State*, 742 N.E.2d 919, 921 (Ind. 2001).

> Davis' proposed jury instruction read as follows:
>
> If you determine that the State has lost, destroyed or failed to preserve evidence whose contents or quality are important to the issues in this case, and that the explanation for the loss, destruction or failure to preserve is inadequate, then you should assume that the evidence was unfavorable to the State. This fact alone may leave you with a reasonable doubt about the accused's guilt.

(Appellant's App. p. 375). Referencing the blood sample ordered by Dr. Smith and tested by Parkview Hospital, Davis asserts that once the test results were released to law enforcement officers, the blood sample became evidence. He maintains that because this sample was subsequently destroyed by the hospital, its destruction amounted to the spoliation of evidence and warranted the tender of the proposed instruction.

Our review of the record indicates that no evidence was presented that this particular sample was actually destroyed. The hospital's certified medical technician,

11

Leslie Robertson (Robertson), who tested the blood sample after it was drawn, testified that if alcohol is detected in a specific specimen, the specimen is frozen for up to three months in the event re-testing is necessary. Pursuant to hospital protocol, the hospital disposes of samples after three months; however, she did not know whether the destruction actually happened. The hospital's chemistry lead technologist, Richard Brown (Brown), confirmed the hospital's protocol to freeze a positive blood alcohol sample for up to three months "in case there would be a request for a recheck from a different laboratory to confirm the alcohol result." (Tr. pp. 637-38). Brown added that pursuant to general protocol the samples would be destroyed at the end of three months but the hospital has the ability to hold samples as long as they want. However, no evidence was presented that the sample of Davis' blood was actually destroyed in accordance with the hospital's general procedure or could no longer be found in the hospital's storage unit. Because this evidence was lacking, there was no evidence in the record that supported the giving of the instruction.

Even if we were to assume, *arguendo*, that the sample was destroyed pursuant to hospital protocol, the presented evidence would still not support the tender of the instruction. Although the proposed instruction clearly states that "the State has lost, destroyed, or failed to preserve evidence," there is no evidence that the State ever had possession of the sample that was ordered by Dr. Smith and stored in accordance with Parkview Hospital guidelines. Brown testified that the hospital retains the sample, freezes it, and at the end of the three month period the samples are incinerated by the hospital. Any test results emanating from the sample can be obtained by law

12

enforcement, but the sample itself is kept by the hospital. No evidence was presented to contradict Brown's testimony or to establish that the State ever had this particular sample in its possession. As there was no evidence supporting the giving of the proposed instruction, the trial court did not abuse its discretion when it rejected the instruction.

## V. *Sentencing*

Lastly, Davis contends that the trial court abused its discretion when it imposed an eighteen year sentence with three years suspended for his conviction for operating while intoxicated causing death, a Class B felony. A person who commits a Class B felony shall be imprisoned for a fixed term of between six and twenty years, with the advisory sentence being ten years. I.C. § 35-50-2-5.

As long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *aff'd on reh'g,* 875 N.E.2d 218 (Ind. 2007). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* Although a trial court may have acted within its lawful discretion in determining a sentence, Appellate Rule 7(B) provides that the appellate court may revise a sentence authorized by statute if the appellate court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Id.* On appeal, it is the defendant's burden to persuade us that the sentence imposed by the trial court is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

With respect to the nature of his crime, Davis claims that "[t]here is nothing regarding the circumstances of the offense that are remarkable." (Appellant's Br. p. 29). While we agree that the nature of Davis' crime is not remarkable, it is nevertheless very serious. Davis' blood alcohol content was .25, well above the statutory limit of .15. Additionally, traces of marijuana and cocaine were found in Davis' blood.

Turning to his character, we note that Davis has an extensive criminal record dating back to 1994. His record includes two felony convictions: a Class D felony theft in 1995 and a Class D felony resisting law enforcement in 2004. He has prior misdemeanor convictions for public intoxication, possession of marijuana, and operating while intoxicated in 2000. Davis' record includes prior crimes of violence with battery misdemeanor convictions in 1998, 2003, 2005, and 2006 as well as other misdemeanor convictions for trespass in 1995, 1996, and 2003, conversion in 1999, and check deception in 2005. He has previously violated his terms of probation. Davis' record clearly speaks of repeated criminal activity that has continued to the present day with no significant period of law-abiding behavior. Furthermore, Davis' pre-sentence investigation report indicates that he is at a high risk to re-offend.

Moreover, it is telling that even though Davis had a blood alcohol content of .25 as well as previous convictions involving drugs and alcohol, he continues to insist that his alcohol use has never been a problem. Despite the clear evidence of guilt and his three attempts to execute a guilty plea, Davis refused to accept any responsibility for his actions.

Based on the evidence before us, we conclude that the sentence is not inappropriate and affirm the trial court's imposition of Davis' sentence.

CONCLUSION

Based on the foregoing, we conclude that: (1) the trial court did not abuse its discretion by admitting Davis' blood test; (2) the State presented sufficient evidence beyond a reasonable doubt to support Davis' conviction; (3) the trial court properly refused to tender Davis' proposed jury instruction on unpreserved evidence; and (4) the trial court properly sentenced Davis.

Affirmed.

NAJAM, J. and DARDEN, S. J. concur