# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 09 2017, 5:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy D. Griner
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Josue Avendano-Gomez, | August 9, 2017 |
| *Appellant-Defendant,* | Court of Appeals Case No. 20A05-1701-CR-160 |
| v. | Appeal from the Elkhart Circuit Court |
| State of Indiana, | The Honorable Terry Shewmaker, Judge |
| *Appellee-Plaintiff* | Trial Court Cause No. 20C01-1507-F2-11 |

**Vaidik, Chief Judge.**

# Case Summary

[1]     Josue Avendano-Gomez was convicted of seven counts of Level 2 felony dealing in cocaine.  On appeal, he argues that the trial court committed fundamental error when it admitted the cocaine exhibits because the State failed to establish a proper chain of custody, that the evidence is insufficient to support his convictions even if the cocaine was properly admitted, and that the trial court violated his Sixth Amendment rights by preventing him from putting on a complete defense and by not allowing him to confront a complaining witness.  Finding no error in the admission of the cocaine, sufficient evidence, and no violation of the Sixth Amendment, we affirm.

# Facts and Procedural History

[2]     The Elkhart County Interdiction and Covert Enforcement Unit uses undercover officers and confidential sources to conduct controlled buys from known drug dealers in the area.  UC 374 is a member of this unit and has worked on over 300 drug investigations.  When UC 374 is leading a controlled buy, he instructs his confidential source to call the alleged drug dealer and suggest a time, place, and quantity of drugs to purchase—all of these details have been provided to the confidential source by UC 374.  The controlled buys in this case were set up in this manner.

[3]     Once the details of the buy have been set, UC 374 searches the confidential source and his automobile for any contraband—money, weapons, drugs, and

anything illegal. When searching the confidential source, UC 374 instructs the source to empty his pockets and then searches the source "from top to bottom and [then] from the bottom to the top again." Tr. Vol. II p. 49. UC 374 does not strip search the source, but he turns the source's pockets inside out, looks in his mouth, and checks the source's genitals by patting down his underwear and using his fingers to "go around the underwear." *Id.* at 191. UC 374 conducted such searches of the confidential source before and after each of the seven controlled buys in this case.

[4] After searching the confidential source, UC 374 searches the source's automobile. UC 374 begins with the driver's seat and works in a clockwise fashion through the interior of the automobile. Once he has finished searching the interior, UC 374 searches the trunk and behind the side mirrors. He then re-searches the interior of the automobile, starting in the backseat and working in a counter-clockwise fashion, ending with the driver's seat. The officer does not remove the dashboard or the fascia underneath the dashboard. UC 374 conducted such searches of the confidential source's car before and after each of the relevant controlled buys, except for the first controlled buy because UC 374 and the confidential source drove to the buy location together in UC 374's car.

[5] UC 374 also provides the confidential source with an audio- and video-recording device. UC 374 has the ability to listen to the transaction live and views the video later at the police station. Before the controlled buy, UC 374 checks the device to make sure that it is working and ensures that it is placed in a location that the alleged drug dealer will not notice. After the buy, UC 374

collects the device from the confidential source, receives a debrief from the source as to what transpired, and reviews the audio and video at the police station to ensure that the information the source told him was accurate. For each of the relevant controlled buys, UC 374 provided the confidential source with an audio- and video-recording device, and UC 374 or another officer listened live to the transaction. After the buys, the confidential source debriefed UC 374, and the officer later reviewed the audio and video at the police station for accuracy.

[6] After a controlled buy, UC 374 takes the substance purchased by the confidential source to the police station. "I'm going to check the weight. It's going to be drug tested, and after that it's going to be put into the evidence room. It's going to be sealed and put into the evidence room." *Id.* at 57. UC 374 also places his undercover number on the bag. "Every time I put something into evidence I have to print the label and describe the day and time, the accused, and my badge number and the case number." *Id.* at 102. However, when specifically discussing each of the controlled buys, UC 374 did not state that he performed any of the above actions with the substances. Rather, he testified that after each buy he took possession of the substances and that they were "logged into evidence." *Id.* at 82.

[7] In this case, UC 374 was introduced to the confidential source in September 2014, and the two began working together to set up controlled drug buys. The confidential source provided UC 374 with the name and contact information for a local cocaine dealer—Avendano-Gomez. Between October 1, 2014, and

May 14, 2015, UC 374 had the confidential source conduct seven controlled buys of cocaine from Avendano-Gomez.

[8] During the seventh controlled buy, Avendano-Gomez met the confidential source in the parking lot of a local restaurant. Rather than follow their traditional modus operandi of Avendano-Gomez getting into the confidential source's car, both men went into the restaurant. No undercover officer was positioned inside the restaurant, but UC 374 was still able to listen live to what was being said via the audio-recording device. The two men remained in the restaurant for an extended period of time, eating a meal together. After exiting the restaurant, Avendano-Gomez and the confidential source entered Avendano-Gomez's truck. The confidential source stayed in the truck for a few minutes before getting into his own car and driving to the pre-determined meeting point with UC 374. As with the first six controlled buys, he gave UC 374 a ball of black electrical tape that contained a white powdery substance. UC 374 reviewed the video of the seventh controlled buy, and it was consistent with the audio that he heard live while conducting surveillance on the restaurant.

[9] Avendano-Gomez was later arrested and charged with seven counts of Level 2 felony dealing in cocaine. Before his trial commenced, Avendano-Gomez requested that the State present the confidential source to be deposed. The State complied with the request, but on the morning of the deposition, at Avendano-Gomez's request, his counsel canceled the deposition. According to the State, Avendano-Gomez's former counsel showed up to the deposition and

said, "I'm really sorry. I just got done meeting with my client. He's instructed me not to proceed with this deposition." *Id.* at 5. On November 14, 2016, the morning the jury trial was scheduled to begin, Avendano-Gomez, represented by new counsel, requested a continuance in order to depose the confidential source. The State told the trial court that it was not calling the confidential source as a witness and informed the court that Avendano-Gomez had personally requested that the confidential source's earlier deposition be canceled. The trial court denied the request for a continuance, noting that Avendano-Gomez had canceled the earlier deposition, that he could depose the confidential source that evening, and that the case had been pending for almost one-and-a-half years due to numerous continuances. Avendano-Gomez did not accept the court's offer to depose the confidential source later that day.

[10] During the trial, UC 374 testified about the details of all seven controlled buys. He stated that after each controlled buy he met with the confidential source and was presented with a white powdery substance, which was usually wrapped in a ball of black electrical tape. UC 374 took possession of the substances and stated that he "logged [each] into evidence." *Id.* at 83. UC 374 also stated that the exhibits were in the same or similar condition as when he logged them into evidence. The State did not ask for any additional details. Based on UC 374's testimony, the State moved for each of the substances to be admitted as Exhibits 3, 6, 8, 10, 12, 14, and 16 (collectively "cocaine exhibits"). Avendano-Gomez did not object, and the trial court admitted the cocaine exhibits.

[11] While questioning UC 374 about the sixth controlled buy, the State examined Exhibit 14 and realized that it had the other cocaine exhibits out of order and that UC 374 had misidentified each of these exhibits and the controlled buy to which the exhibit corresponded. The State then re-presented these exhibits to UC 374 and asked him to match them to the correct controlled buy, which he did. The State then moved to have the exhibits readmitted.[1] Again, Avendano-Gomez did not object to the admission of the exhibits. The trial court readmitted the cocaine exhibits.

[12] The State also had two certified technicians with the Indiana State Police Laboratory Division testify that the seven exhibits were tested and that each exhibit weighed over ten grams and tested positive for cocaine, pure or adulterated. Before each lab technician testified, Avendano-Gomez stipulated to certain facts. Regarding the first technician's testimony, he stipulated "to her training and background and education. We're stipulating that she performed forensic testing on four substances in this case; and we're stipulating that the scale that she used to weigh the substances when they were tested was in good proper working order." *Id.* at 205. Defense counsel later added, "[W]e stipulate to the - - the fact that each one of the samples was, in fact, tested as cocaine and that the weight represented in each of the reports was accurate."

---

[1] For example, Exhibit 3 was originally admitted as the substance purchased during the October 1, 2014 controlled buy but was actually purchased during the May 14, 2015 controlled buy.

*Id.* at 206.  During the laboratory technician's testimony about the lab reports, defense counsel interjected:

> Defense Counsel: We've already stipulated to the document, Judge, and the  - -
>
> State: But I need - - I need to link it up to the amount.
>
> Defense Counsel: We'll stipulate to that too, that they link up with the particular samples.

*Id.* at 211.

[13]  Regarding the second laboratory technician, Avendano-Gomez stipulated to "this witness's training and background and education.  His ability to test the substances involved in this case.  The fact that the scales were in good proper working order for the three substances that he tested."  *Id.* at 240.  Avendano-Gomez also stipulated to the admission of the seven laboratory reports that confirmed that the substances tested in this case were cocaine.  Both technicians testified that the cocaine exhibits were in the same condition as when they were tested, and the lab reports described each exhibit as a "[s]ealed plastic bag" containing a white powdery substance. Exs. 22–28.  One of the lab technicians stated that she was able to match up the relevant exhibit with the corresponding report based on the labels UC 374 had affixed to the evidence bags containing each substance.

The jury found Avendano-Gomez guilty on all seven counts, and the trial court sentenced him to concurrent terms of twenty-six years, all executed at the Indiana Department of Correction. Avendano-Gomez now appeals.

# Discussion and Decision

Avendano-Gomez raises three issues on appeal: (1) the trial court committed fundamental error when it admitted the cocaine exhibits because the State failed to establish a sufficient chain of custody for each exhibit; (2) the evidence is insufficient to support the convictions; and (3) the trial court violated his Sixth Amendment rights to present a complete defense and to cross-examine a complaining witness.

# I. Chain of Custody

Avendano-Gomez argues that the cocaine exhibits should not have been admitted because the State failed to establish a proper chain of custody for each exhibit. "The purpose of requiring a continuous chain of custody from seizure to admission at trial is to lay a proper foundation connecting the evidence with the accused and to negate any substantial likelihood of tampering, loss, substitution, or mistake." *Young v. State*, 508 N.E.2d 24, 26 (Ind. 1987). When the defendant challenges the chain of custody for fungible evidence, like cocaine, a burden-shifting analysis is applied:

> The State bears a higher burden to establish the chain of custody of "fungible" evidence, such as blood and hair samples, whose appearance is indistinguishable to the naked eye. To establish a

proper chain of custody, the State must give reasonable assurances that the evidence remained in an undisturbed condition. However, the State need not establish a perfect chain of custody, and once the State "strongly suggests" the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties.

*Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002) (internal citations omitted). If the State meets its burden of strongly suggesting the exact whereabouts of the evidence, the defendant, to successfully challenge the chain of custody, "must present evidence that does more than raise a mere possibility that the evidence may have been tampered with." *Id*.

[17] Avendano-Gomez contends that the State failed to strongly suggest the exact whereabouts of the cocaine exhibits, arguing that no evidence was introduced to show the exhibits' location from the time UC 374 logged them into evidence to the time they were tested at the state laboratory. But Avendano-Gomez did not object at trial when the exhibits were admitted, and he acknowledges this failure on appeal. We require a party to make an objection so that the court and the opposing party are on notice that some aspect of the proceeding is being done improperly, and either the court or the opponent is afforded the opportunity to correct the alleged error. Therefore, when a defendant fails to object at trial and raises a chain-of-custody argument for the first time on appeal, the argument is waived unless the admission constitutes fundamental error. *Id*. Fundamental error is an extremely narrow exception to our waiver

rule, and the defendant is faced with the "heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Id.*

[18] We need not reach Avendano-Gomez's fundamental-error argument because we conclude that the cocaine exhibits were properly admitted. First, Avendano-Gomez stipulated during trial that both laboratory technicians performed forensic testing on "substances involved **in this case.**" Tr. Vol. II p. 240 (emphasis added); *see also id.* at 205 ("she performed forensic testing on four substances **in this case**.") (emphasis added). He argues that his stipulations were only to the laboratory results and not to the source of the substances. But Avendano-Gomez's stipulations are not as narrowly tailored as he would have us hold. His stipulations were related to the substances involved "in this case," not just for the substances presented at trial. The word "case" encompasses all of the events that transpired, including the seven controlled buys as well as the events at trial. The stipulations go beyond the laboratory results, and Avendano-Gomez stipulated that the substances recovered by UC 374 after the controlled buys were the same substances that the laboratory technicians tested. Furthermore, Avendano-Gomez expanded the stipulation to include that the

lab reports link up with the cocaine exhibits. These stipulations removed the need for the State to present chain-of-custody evidence.

[19] We find that defense counsel's failure to object both times that the cocaine exhibits were admitted is further support of our reading of the stipulation. Avendano-Gomez's defense at trial was not that the chain of custody was insufficient but rather that the State failed to definitively prove that the cocaine came from Avendano-Gomez and not the confidential source. In other words, Avendano-Gomez's defense was focused on how the cocaine ended up in the confidential source's possession, not what happened to the cocaine after it was given to UC 374. This defense strategy further bolsters our conclusion that the stipulations served to eliminate the State's chain-of-custody requirement.

[20] Even if we were to agree with Avendano-Gomez that his stipulation was narrowly tailored to only the results of the laboratory testing, sufficient evidence was presented to establish a chain of custody for the cocaine exhibits. While testifying generally about controlled buys, UC 374 stated that whenever he collects a substance from a confidential source, "I'm going to check the weight. It's going to be drug tested, and after that it's going to be put into the evidence room. It's going to be sealed and put into the evidence room. . . . Every time I put something into evidence I have to print the label and describe the day and time, the accused, and my badge number and the case number." Tr. Vol. II pp. 57, 102. UC 374 stated that each of the seven substances was "logged into evidence" after the controlled buys, creating a reasonable inference that he weighed, field tested, labeled, and sealed the substances in an evidence bag, and

then placed the sealed bag into the evidence room. We presume regularity in the handling of evidence by officers. *Troxell*, 778 N.E.2d at 814. When presented with the cocaine exhibits at trial, UC 374 testified that he recognized each exhibit based on the label that he created that was affixed to the evidence bag. The label included the date and time the substance was recovered, Avendano-Gomez's name, UC 374's badge number, and the case number. UC 374 also stated that each exhibit was in the same or substantially the same condition as when he logged it into evidence.

[21] Additionally, both lab technicians testified that the cocaine exhibits were in the same condition at trial as when they were tested, and each of the lab reports, the admission of which Avendano-Gomez stipulated to, described each exhibit as a "[s]ealed plastic bag" containing a white powdery substance. Exs. 22–28. One of the lab technicians testified that she recognized the exhibits based on the label UC 374 created and placed on the evidence bag. The jury was also allowed to view and examine the exhibits, including UC 374's labels. Given that we presume regularity in the handling of evidence by police, that UC 374 testified that it is his habit to seal and label substances recovered from controlled buys before logging them into evidence, and that the laboratory reports described each exhibit as a "sealed plastic bag," we conclude that sufficient evidence was presented to establish a chain of custody. No error, let alone fundamental error, was committed when the cocaine exhibits were admitted at trial.

# II. Sufficiency of Evidence

[22] In his second argument, Avendano-Gomez contends that, even with the cocaine exhibits, the evidence is insufficient to support his convictions. When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor determine the credibility of witnesses; that role is reserved for the factfinder. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). "The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction." *Id.* A conviction will be affirmed "if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

[23] Avendano-Gomez claims that his convictions must be overturned because UC 374 did not properly search the confidential source before and after each buy because he did not look inside the confidential source's underwear. "A controlled buy consists of **searching the person who is to act as the buyer**, removing all personal effects, giving him money with which to make the purchase," and then sending him to make the purchase. *Vaughn v. State*, 13 N.E.3d 873, 888 (Ind. Ct. App. 2014), *trans. denied.* "Upon his return he is again searched for contraband." *Id.* Pat-down searches of a confidential source are sufficient for a controlled buy, and officers are not required to strip-search the confidential source. *Wright v. State*, 836 N.E.2d 283, 289 (Ind. Ct. App. 2005), *trans. denied*.

[24] Before and after each of the seven controlled buys, UC 374 instructed the confidential source to empty his pockets and then searched him "from top to bottom and [then] from the bottom to the top again." Tr. Vol. II p. 49. UC 374 also turned the confidential source's pockets inside out, looked in his mouth, and patted him down. UC 374 testified that he checked the confidential source's genitals by using his hands to pat down the confidential source's underwear and that he used his fingers to "go around his underwear." *Id.* at 191. UC 374's search of the confidential source was sufficient for a controlled buy.

[25] Avendano-Gomez also argues that the search of the confidential source's car was insufficient because UC 374 did not search inside the dashboard or the panel fascia under the dashboard. Avendano-Gomez does not cite to any legal authority to support his argument, and we are not aware of any. Nevertheless, we find that the strip-search logic articulated in *Wright* can be applied to automobile searches. An officer is not required to disassemble the interior of an automobile when conducting pre- and post-buy searches of a confidential source's automobile. UC 374 testified that he searched the confidential source's car before and after each controlled buy when the confidential source drove himself to the buy location. UC 374 explained that when he conducted the searches he started with the driver's seat and worked his way through the interior in a clockwise fashion. He then searched the trunk and behind the side mirrors. UC 374 then searched the interior again, this time working in a

counter-clockwise fashion, ending with the driver's seat. UC 374's search of the confidential source's car was sufficient for a controlled buy.

[26] Avendano-Gomez further contends that the evidence is insufficient because no eyewitness testimony was offered to show that he possessed and transferred cocaine to the confidential source during any of the controlled buys. "A properly conducted controlled buy will permit an inference the defendant had prior possession of a controlled substance." *Vaughn*, 13 N.E.3d at 888. As already stated, a controlled buy consists of pre- and post-buy searches of the confidential source, giving money to the confidential source for the buy, and sending the confidential source to the buy location. Officers do not have to witness the transfer of drugs to create the inference that the defendant possessed the drugs and gave them to the confidential source. *Id.* Officers need only to witness the confidential source leave their custody and head directly to the controlled-buy location and then leave the buy and head directly to the post-buy location to create the necessary inference that the defendant sold the drugs to the confidential source. *Id.*

[27] During five of the seven controlled buys (buys two through six), UC 374 and other members of the Interdiction and Covert Enforcement Unit observed Avendano-Gomez enter the confidential source's car, stay inside the car for a few minutes, and then leave. They followed the confidential source to the post-buy location, where he provided UC 374 with a white powdery substance that was later confirmed to be cocaine. For the other two controlled buys (buys one and seven), UC 374 and his fellow officers observed the confidential source

enter Avendano-Gomez's truck, stay for a few minutes, and then exit the truck. The officers then followed the confidential source to the post-buy location where he handed UC 374 a white powdery substance that was later confirmed to be cocaine.

[28] Avendano-Gomez further contends that the seventh controlled buy was not properly controlled because no undercover officer was inside the restaurant "with potentially many other people who could have transferred [the confidential source] a controlled substance." Appellant's Br. p. 20; Appellant's Reply Br. p. 10. This is a request for us to reweigh the evidence. Officers are not required to witness every aspect of a controlled buy to create the inference that the confidential source purchased drugs from the defendant. *Vaugh*, 13 N.E.3d at 888. UC 374 listened live to the interaction between Avendano-Gomez and the confidential source along with any possible interaction that the confidential source might have had with other people inside the restaurant. UC 374 then reviewed the video of the controlled buy and reported that it was consistent with the audio he had heard. Sufficient evidence was presented to support each of Avendano-Gomez's seven convictions for Level 2 felony dealing in cocaine.

## III. Sixth Amendment

[29] Avendano-Gomez raises two arguments that his Sixth Amendment rights were violated: he was unable to present a complete defense and unable to confront a complaining witness. Avendano-Gomez argues that the trial court's denial of

his request for a continuance so that he could depose the confidential source prevented him from being able to present a complete defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Kubsch v. State*, 784 N.E.2d 905, 923-24 (Ind. 2003) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

[30] Avendano-Gomez argues that because he was not able to depose the confidential source he was not able to call the confidential source as a witness. But Avendano-Gomez, while represented by different counsel, scheduled a deposition of the confidential source that was then canceled at Avendano-Gomez's personal request. The morning his trial was scheduled to begin, Avendano-Gomez sought a continuance to depose the confidential source. The request for a continuance was denied, but the trial court permitted Avendano-Gomez to depose the confidential source after the first day of trial. The court even agreed to defense counsel's request that Avendano-Gomez be present for the deposition, stating that the deposition could be conducted at the jail where Avendano-Gomez was in custody. However, defense counsel did not schedule this deposition. Avendano-Gomez's Sixth Amendment right to present a complete defense was not violated.

[31] Avendano-Gomez also contends that his Sixth Amendment right to cross-examine a complaining witness was violated because he was not given the opportunity to cross-examine the confidential source. The Sixth Amendment

provides, "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." The Confrontation Clause "bars admission of out-of-court, testimonial statements in criminal trials unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross examination." *Ramirez v. State*, 928 N.E.2d 214, 217 (Ind. Ct. App. 2010) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)), *trans. denied*. There is no confrontation issue here because the State never called the confidential source to testify on its behalf, and the trial court sustained all objections defense counsel made regarding any out-of-court statements made by the confidential source.

[32] Affirmed.

Brown, J., and Pyle, J., concur.