**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MARK D. OSTERMAN**
Public Defender's Office
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GARY R. ROM**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TACUMA G. WOLFE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 18A05-1111-CR-604 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable John M. Feick, Judge
Cause No. 18C04-0901-FB-1

**August 22, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant Tacuma G. Wolfe appeals his conviction for Dealing in Cocaine,[1] a class B felony. Specifically, Wolfe argues that his due process rights were violated because of various instances of prosecutorial misconduct. Wolfe claims that the State failed to provide him with the name of the confidential informant (C.I.), and that the trial court permitted one of the police officers to portray Wolfe as a drug dealer in front of the jury. Wolfe also maintains that the deputy prosecutor engaged in improper discussions with the jury during voir dire about the harmful effects of having a drug dealer in the community. Wolfe further claims that the trial court erred in admitting the cocaine into evidence because the State failed to establish a proper chain of custody of the drugs that were seized, and that the State intentionally withheld an audio recording of the drug transaction from him. Finally, Wolfe contends that his conviction should be set aside because he never received a plea agreement that the State had offered to him. Finding no prosecutorial misconduct, and concluding that there was no other error, we affirm the judgment of the trial court.

FACTS

On September 19, 2008, Officers Tony Skinner and Jeff Stanley of the Delaware County Sheriff's Office picked up a C.I. to conduct a controlled drug buy with Wolfe. Officer Skinner outfitted the C.I. with a recording device and an audio transmitter so that the officers could listen to the buy "live." Tr. p. 253, 284, 360-61. A search of the C.I. revealed no contraband. The C.I. was also given $100 in marked buy money. After the

_____

[1] Ind. Code § 35-48-4-1.

2

officers dropped the C.I. off at a McDonald's Restaurant, the C.I. walked two blocks to an open parking lot. The officers parked in an empty parking lot across the street to watch.

The C.I. arranged for the buy to occur at 2:00 p.m., but when Wolfe had not appeared by that time, Officer Skinner phoned the C.I. and told him to call Wolfe. The C.I. did so, and after two telephone conversations, Wolfe arrived at approximately 2:15 p.m. Wolfe parked his green pick-up truck on the street next to the curb near the area of the parking where the C.I. was standing. No one else was inside the truck and no other vehicles were in the immediate vicinity. The C.I. walked to the passenger side of the truck and after a brief conversation, the C.I. stepped back and the truck drove away.

Officer Stanley exited the vehicle and maintained visual contact with the C.I. as the C.I. walked back to McDonald's. Officer Skinner followed the green pick-up truck and after several blocks, pulled beside the truck and confirmed that Wolfe was the driver. In fact, Officer Skinner was "absolutely positive" that Wolfe was driving. Tr. p. 270. Wolfe was not arrested at this time because the investigation was ongoing.

Officer Skinner picked up the C.I. and Officer Stanley. The C.I. handed Officer Skinner an off-white rock-like substance that subsequently tested positive for cocaine. The C.I. also handed Officer Skinner $20 because Wolfe had only $80 worth of crack cocaine. Wolfe was subsequently arrested on January 22, 2009, while driving the same green pick-up truck.

On January 27, 2009, Wolfe was charged with two counts of dealing in cocaine, a class B felony. The police report in this case stated that a digital audio recording had been made of the transaction. It specifically indicated that "A CD was made from the digital recording . . . [and] is included with this case. The audio from that recording is very poor quality and no transcripts are included with this case." Tr. p. 57.

On February 17, 2010, E. Phillip Gregg, a public defender, requested the recording of the transaction. When a CD of the audio recording had not been released to Gregg, discussions commenced about the missing recording to no avail. On October 20, 2010, the deputy prosecutor informed the trial court that the investigating police officer was in Israel and upon his return, she would inquire again about the CD. On March 2, 2011, Wolfe, who was not represented by counsel at the time, informed the trial court that he had still not received a recording of the transactions. As a result, the trial court issued an order requiring the CD to be turned over to Wolfe in one week.

Wolfe had still not received the recording as of April 6, 2011. Wolfe's stand-by public defender informed the trial court that there had been mention of an audiotape in the form of a CD that is unintelligible. However, the public defender explained to the trial court that Wolfe should have the right to make a copy and determine for himself whether the recording is unintelligible. The trial court then ordered the State to turn over the CD to Wolfe within ten days.

Also at the hearing on April 6, 2011, the deputy prosecutor indicated that she could provide Wolfe with information about the C.I.'s deal with law enforcement and his

4

criminal history. However, the deputy prosecutor stated that she would not provide Wolfe with the C.I.'s name. Wolfe responded that he did not care about withholding the C.I.'s name. In fact, Wolfe commented that

> [A]s far as the C.I. is concerned, <u>I'm not asking for the C.I.'s name</u>, sir, I'm asking for the C.I.'s, his docket number, or whatever, reference number. Also his criminal history. <u>I'm not asking for his name, sir. I mean, if they want to withhold that, that's fine. I have no problem with that</u>.

Tr. p. 54 (emphases added). Wolfe also indicated that he knew "for a fact" that the C.I. was in prison. <u>Id.</u> at 63. Even though it was later determined that Wolfe already knew the C.I.'s identity, the trial court ordered the State to provide Wolfe with the C.I.'s identity and criminal history.

The trial court also heard argument about the issue of the chain of custody concerning the cocaine that was purchased during the controlled buy. More particularly, Wolfe raised the issue of the admissibility of the cocaine at trial. Wolfe argued to the trial court that the cocaine was placed in a safe at the Drug Task Force (DTF) office for four days and was improperly handled, marked and had not been secured. The State denied that there was any issue concerning the chain of custody, so Wolfe sought the trial court's assistance. The trial court commented that the issue is "not for suppression. But I will look at it." Tr. p. 86. However, the trial court made no finding as to the issue.

Wolfe also believed that the criminal history the State provided him concerning the C.I. was inaccurate. Tr. p. 63-64. However, the deputy prosecutor asserted that she had revealed what she knew about the C.I. and law enforcement officials. The deputy

5

prosecutor stated that the C.I. was "working off charges" and the police officer that the deputy prosecutor spoke with knew nothing more than that. Id. at 72. The trial court took Wolfe's motion for contempt against the State and his motion to exclude evidence under advisement. The trial court ultimately denied Wolfe's motion to hold the State in contempt.

The State dismissed one of the counts against Wolfe on April 21, 2011. At a pretrial conference on May 11, 2011, Wolfe pointed out that he did not receive any information about the recording from the State, despite the trial court's earlier order. In response, the deputy prosecutor maintained that there was only one CD of the transaction, and Wolfe was in possession of it. However, Wolfe argued that the CD that was provided was based on the case that had been dismissed. The deputy prosecutor then informed the trial court that if the audio was, in the opinion of the police officer, totally inaudible, the recording would have been destroyed. The deputy prosecutor added that she "did try to locate a second CD. . . . We cannot produce that which we do not have." Tr. p. 64. The deputy prosecutor made it clear that no other recording existed, and there was no other information about whether it was disposed of or not, but the staff did, in fact, search for it.

At a subsequent hearing on September 7, 2011, the deputy prosecutor confirmed the she did not receive an audio CD because none existed. The trial court determined that Wolfe can argue about the missing evidence at trial.

A two-day jury trial commenced on September 26, 2011. During voir dire, the deputy prosecutor engaged in discussions with the jury about the effects that a drug dealer has on the community, including fears of theft and violence. The deputy prosecutor noted that drugs and dealing in them can lead to other serious issues. The deputy prosecutor then used this approach in both the opening and closing statements.

During the re-cross examination of Officer Skinner, Wolfe wanted to know how Officer Skinner was able to identify him as the individual who was driving the green pick-up truck. Wolfe proceeded pro se, and the following exchange occurred:

> [DEFENDANT]: Looks identical, but you just said you couldn't describe me, but a big black male. That opening statement she said, you had prior dealings with me, yes or no?

> [SKINNER]: I knew who you were, yes.

> [DEFENDANT]: So, if you've seen me and you know me, then you know who I am, correct? Yes or no?

> [SKINNER]: Yes.

Tr. p. 402-03. Wolfe finished questioning Officer Skinner and the trial court proceeded to ask him several questions that had been submitted by the jury:

> THE COURT: I've got several [juror] questions here. When did you initially identify the driver of the green pick up truck as the Defendant?

> [SKINNER]: I initially identified him after I followed the truck and got the license plate number then pulled alongside of him and recognized him as Tacuma Wolfe.

7

THE COURT: On that question, any follow up?

PROSECUTOR: And prior to that date, you were well aware of what the Defendant looked like, is that correct?

[SKINNER]: I knew Tacuma Wolfe, yes.

PROSECUTOR: No further questions on that one.

THE COURT: Mr. Wolfe, any follow up on that?

DEFENDANT: How do you know Tacuma Wolfe? He said he knew Tacuma Wolfe. I want to know how he knew Tacuma Wolfe.

THE COURT: Go ahead. Ask a question [sic].

[SKINNER]: As a police officer of fifteen years, I know that, I know Tacuma Wolfe through the community. I know that Tacuma Wolfe has, you know, a criminal background and I've dealt with him in my law enforcement career before.

DEFENDANT: And when was this that you dealt with me in your law enforcement, what year was this?

[SKINNER]: I can't give exact dates.

DEFENDANT: Can you give years? Don't give dates. Just go with years.

8

[SKINNER]: <u>In my time at the Drug Task Force, I was very aware of who Mr. Tacuma Wolfe was</u>.

Tr. p. 404-05 (emphases added).

Wolfe was found guilty as charged and the trial court subsequently sentenced him to fifteen years of incarceration at the Indiana Department of Correction (DOC) with three years suspended. At the sentencing hearing, Wolfe claimed that the State had offered him a plea agreement during the second day of trial, but he had never received it. The State did not respond at the time, but it later filed a report to the court, clarifying what had occurred. More particularly, the deputy prosecutor stated that a plea offer had been extended to Wolfe when he was represented by counsel. Because Wolfe was represented by counsel when the offer was made, the deputy prosecutor did not directly communicate any offer to Wolfe. Wolfe now appeals.

DISCUSSION AND DECISION

I. Prosecutorial Misconduct

A. Standard of Review

The review of a prosecutorial misconduct claim requires two steps. First, we must determine whether the prosecutor engaged in misconduct. <u>Carter v. State</u>, 956 N.E.2d 167, 169 (Ind. Ct. App. 2011), <u>trans.</u> <u>denied</u>. We then determine "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected." <u>Id.</u> The gravity of peril is measured

9

by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. Booher v. State, 773 N.E.2d 814, 817 (Ind. 2002).

When the error is not preserved by a contemporaneous objection, the defendant must not only establish the grounds for prosecutorial misconduct, but also the grounds for fundamental error in order to succeed on his claim. Id. at 818. Fundamental error is a "substantial, blatant violation of due process" that is so prejudicial to the rights of the defendant that a fair trial was impossible. Hall v. State, 937 N.E.2d 911, 913 (Ind. Ct. App. 2010).

## B. Revealing the C.I.'s Identity

Wolfe contends that he is entitled to a reversal because the deputy prosecutor did not disclose the C.I.'s identity to him. Wolfe argues that the deputy prosecutor's refusal to comply with the trial court's order to do so constituted prosecutorial misconduct.

As noted above, Wolfe indicated to the trial court that he had "no problem" with the State withholding the C.I.'s name. Tr. p. 54. Moreover, at a later pretrial conference, Wolfe indicated that he knew who the C.I. was and knew "for a fact" that the C.I. was in prison. Id. at 63-64. The deputy prosecutor did share with Wolfe what she knew about the deal that the C.I. had with law enforcement officials, in that he was "working off charges" and the police officer that the deputy prosecutor spoke with "did not know any more than that." Id. at 72.

Even though the State did not comply with the trial court's order for it to produce the name of the C.I., Wolfe has shown no prejudice in light of the failure to do so because

10

of his statement at the pretrial conference that he did not care whether the State withheld his identity. And, as mentioned above, Wolfe already knew who the C.I. was. Thus, Wolfe's claim of prosecutorial misconduct fails with regard to this issue. See Smith v. State, 829 N.E.2d 64, 71 (Ind. Ct. App. 2005) (holding that a defendant's knowledge of the informant's identity establishes that the decision to withhold the informant's identify is harmless error).

### C. Questioning Officer Skinner

Wolfe next contends that the trial court erred in permitting the deputy prosecutor to establish, through the questioning of Officer Skinner, that Wolfe is a drug dealer. In other words, Wolfe blames the deputy prosecutor for the alleged inflammatory statements that Officer Skinner made in response to Wolfe's questions at trial.

In resolving this issue, we note that a party may not invite error, and later argue that such error supports a reversal. Pinkton v. State, 786 N.E.2d 796, 798 (Ind. Ct. App. 2003). In other words, a party many not take advantage of an error that he or she commits, invites, or which is the natural consequence of his or her own neglect or misconduct. Wright v. State, 828 N.E.2d 904, 907 (Ind. 2005). Invited error is not subject to review on appeal. Pinkton, 786 N.E.2d at 798.

In this case, the record shows that Officer Skinner answered the deputy prosecutor's questions as to how he knew Wolfe only in generalities. However, it was Wolfe, himself, who continued to press the issue. Thus, Officer Skinner answered the questions in more detail. As a result, Wolfe invited any error that might have occurred

11

with regard to this issue, when he asked Officer Skinner how he knew him and Officer Skinner testified that he knew Wolfe had a "criminal background," and that he has "dealt with him in his law enforcement career." Tr. p. 404-05. As a result, Wolfe's claim of prosecutorial misconduct with regard to this issue fails.

### D. Questioning During Voir Dire

Wolfe next claims that his conviction must be reversed because he was prejudiced by the questions that the deputy prosecutor asked the jurors about drug dealing in the community. Wolfe contends that the deputy prosecutor improperly attached the fears of theft and violence that drug dealers cause in the community, to Wolfe.

We initially observe that Wolfe did not object to any of the deputy prosecutor's comments. However, Wolfe points out that the trial court's instructions prohibiting objections during voir dire and in counsels' opening and closing statements amounted to a chilling effect that entitles him to a reversal. Appellant's Br. p. 22-23.

The trial court directly informed Wolfe, who was proceeding pro se at the time, that "unnecessary objections" during voir dire or in opening and closing argument that were not legally necessary would not be "looked favorably upon." Tr. p. 102. Moreover, it was made clear that if Wolfe said anything improper, the deputy prosecutor or the trial court might interrupt him. Appellant's App. p. 115-16. Those interruptions, according to the trial court, are "not good." Id. at 116.

The trial court told Wolfe that objections must be based on the law and that applicable rules of procedure and non-meritorious objections would not be tolerated. The

12

trial court also stated that if trained counsel made the same type of objection, they would not be tolerated. Moreover, it was made clear to Wolfe that he would be held to the same standard as an attorney, as long as he proceeded pro se. We cannot say that the trial court erred by instructing Wolfe in this regard. See Evans v. State, 809 N.E.2d 338, 344 (Ind. Ct. App. 2004) (observing that pro se litigants without legal training are held to the same standard as trained counsel and are required to follow procedural rules). Thus, Wolfe failed to preserve the error on appeal. Therefore, he must prove fundamental error to prevail on his argument.

That said, the purpose of voir dire is to examine jurors and "ascertain whether jurors can render a fair and impartial verdict in accordance with the law and the evidence." Coy v. State, 720 N.E.2d 370, 372 (Ind. 1999). Proper examination is used to discover whether a prospective juror has an "opinion, belief, or bias" that might affect the juror's ability to determine the issues at trial that would lead a party to strike the juror by either peremptory strike or challenge for cause. Gregory v. State, 885 N.E.2d 697, 706 (Ind. Ct. App. 2008).

Questions designed to uncover a juror's attitude about the type of charged crime is proper. Id. at 707. And to reveal the jurors' attitudes and ideas, the parties may pose hypothetical questions, provided they do not suggest prejudicial evidence not adduced at trial. Id. A prosecutor should not educate jurors during voir dire and any attempt to indoctrinate the jury may require reversal if the prosecutor's questions amount to misconduct, and if that misconduct subjects the defendant to grave peril. Coy, 720

13

N.E.2d at 372. The gravity of the peril is determined by the probable persuasive effect on the jury's decision, not by the degree of impropriety of the conduct. Id.

Our review of the record reveals that the deputy prosecutor's statements and questions during voir dire were attempts to uncover hidden biases or beliefs about confidential informants and whether potential jurors were sympathetic to defendants who were subject to controlled buys through a confidential informant. Tr. p. 170-73, 202-04. Moreover, it is apparent that the deputy prosecutor wanted to ensure that no juror would harbor ill will against the State when it did not present the C.I. as a witness at trial, as well as whether any juror might be sympathetic to drug users. Id. at 172-74, 178-83, 203-08. In short, the deputy prosecutor wanted to know the jurors' thoughts about the laws prohibiting drug use and drug dealing. See Gregory, 885 N.E.2d at 707 (finding no misconduct when the prosecutor asked jurors their attitudes towards methamphetamine and the laws circumscribing its creation and use). Thus, the deputy prosecutor committed no error as she examined potential jurors regarding their opinions, beliefs, or biases.

Wolfe also contends that it was improper for the deputy prosecutor to mention the dangerous effects that drug dealing and drug use have on the community. Appellant's Br. p. 24. In our view, such remarks are simply statements of opinion by the deputy prosecutor that are not prohibited. See Emerson v. State, 952 N.E.2d 832, 837 (Ind. Ct. App. 2011) (noting that statements of opinion by counsel are not prohibited during arguments to the jury), trans. denied. Moreover, there was no danger that those comments placed Wolfe in a position of grave peril. Indeed, it is no secret that drug

dealing and drug usage have resulted in undesirable effects in various communities. The deputy prosecutor simply made known her feelings about drug use in the community. See Gregory, 885 N.E.2d at 708 (finding no misconduct when the prosecutor's opinion about the disastrous effects drug use causes a community). As a result, we conclude that there was no prosecutorial misconduct with regard to this issue.

### E. Wolfe's Alleged Confession to Being a Drug Dealer

Wolfe next argues that the prosecutor's comments during final argument that Wolfe implicitly admitted to being a drug dealer placed Wolfe in grave peril or constituted fundamental error. However, as discussed above, a deputy prosecutor can discuss the evidence and reasonable inferences during closing argument that can be derived therefrom so long as there is no implication of personal knowledge that is independent of the evidence. Emerson, 952 N.E.2d at 837. And statements of opinion are not prohibited. Id.

In this case, the deputy prosecutor argued that through Wolfe's own questioning of a witness, he implicitly admitted to being a drug dealer. Tr. p. 439. In support of his contention that prosecutorial misconduct occurred with regard to this issue, Wolfe points to the following remarks of the deputy prosecutor:

> Through the Defendant's own questioning, he asked Investigator Skinner How do you know me? How do you know me? He asked them several times and finally investigator Skinner said as a Drug Task Force, I have had prior dealings with the Defendant as a criminal. As a Drug Task Force member. That is how I knew who you were before September 18, 2008. So the State has identified the defendant. Also through the defendant's questions with Investigator Stanley, the Defendant stated there was a

15

discussion about the C.I. and the person in the truck. The Defendant said quote, whatever you want to call me, the drug dealer. The Defendant admitted he was the person who was conversing with the C.I. on September 18, 2008 through his questioning of investigator Stanley.

Tr. p. 439.

Wolfe did not object to these remarks. And in our view, the deputy prosecutor's use of Wolfe's questions to a witness during her final argument did not place Wolfe in grave peril or amount to fundamental error because the statement that the deputy prosecutor was referring to was already heard in open court by the jury. The deputy prosecutor did not reference any personal knowledge that was independent of the evidence that had been offered at trial. Furthermore, any prejudicial effect was lessened by the trial court's instruction that the statements made by the deputy prosecutor and Wolfe were not evidence. Tr. p. 457.

The deputy prosecutor's remarks were also rendered harmless by the evidence that the State presented. Only one person was inside the green pick-up truck that pulled up next to the C.I. Id. at 277, 363, 377, 389-90. Officer Skinner never lost visual contact with the truck and when he pulled up next to it, he was "absolutely positive" that Wolfe was the driver. Id. at 261, 270, 288, 395, 402, 404, 432. In light of this testimony, any error that might have resulted from the deputy prosecutor was harmless.

## II. Spoliation and Destruction of Evidence

Wolfe maintains that the trial court improperly ruled concerning the State's alleged destruction and withholding of evidence. In particular, Wolfe argues that the

16

State intentionally withheld the audio recording of the controlled buy that was obtained by a digital recorder outfitted on the C.I. In other words, Wolfe maintains that the deputy prosecutor was deliberately withholding a recording of the transaction or that it had been destroyed because it was established the C.I. had been equipped with a recording device during the transaction. Wolfe also points out that a police report makes specific mention of an audio disc that was of poor quality.

Notwithstanding this contention, Wolfe does not support his assertion with proper citation to the record. Appellant's Br. 29. The probable cause affidavit makes no such claim; nor does the supplemental report that Officer Skinner had filed. Appellant's App. p. 19. A search of other documents in Wolfe's appendix that has been filed with this court similarly yields no such results. The supplemental report did note that the C.I. was outfitted with a digital recorder and that Officer Skinner took possession of the recording device after the drug buy. Def.'s Ex. A. However, the report did not mention that the conversation was actually recorded or that Officer Skinner listened to it. Def.'s Ex. A.

As noted above, there was confusion prior to trial about whether a disc of the recording ever existed, but Officer Skinner's testimony during trial ended the confusion. More specifically, Officer Skinner testified that a disc was never produced and one never existed because the recording device had malfunctioned. Officer Skinner testified that they "had a technical malfunction and the disc was never created. The disc was never made because the recording never happened." Tr. p. 288, 311, 317. In short, the State

17

could not produce what never existed. Thus, it was impossible for the State to produce an audio disc of the drug buy.

Also, the trial court informed Wolfe that he could ask the officers about the recording at trial. Tr. p. 131. The testimony that the recorder malfunctioned and no disc had ever been made was conveyed to the jurors, and they were free to believe or disbelieve that testimony. Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007).

Finally, even assuming solely for the sake of argument that the recorder did not malfunction and something was recorded, we cannot say that the decision of the law enforcement officials to not make an audio disc violated Wolfe's due process rights. More particularly, Wolfe has made no showing that the individual who delivered the drugs to the C.I. was not him and he only asks us to speculate as to the contents of the recording. See Chissell v. State, 705 N.E.2d 501, 504 (Ind. Ct. App. 1999) (holding that videotapes of the defendant taking field sobriety tests were not materially exculpatory because the defendant presented no evidence that the tapes would show him passing the tests, and instead asked this court to speculate as to the contents of the tapes); see also Terry v. State, 857 N.E.2d 396, 406 (Ind. Ct. App. 2006) (observing that this court will not speculate as to how evidence might exonerate the defendant).

Moreover, the police officers' testimony established that it was Wolfe who delivered the drugs to the C.I. Tr. p. 270, 397, 402, 404. Because Wolfe purportedly knew the C.I.'s identity, he could have deposed him and used such evidence to support his claim that he was not the individual who delivered the drugs. In short, Wolfe had

18

nothing to support his contention that any alleged recording of the transaction—assuming that one even existed—was exculpatory. Finally, Wolfe has failed to show that the State destroyed any alleged recording in bad faith. For all of these reasons, Wolfe has failed to show that his due process rights were violated with regard to any destruction or spoliation of evidence. Thus, Wolfe is not entitled to a reversal on this basis.

### III. Chain of Custody

Wolfe next argues that the trial court erred in allowing the cocaine to be admitted into evidence because the State failed to establish an adequate chain of custody with regard to the drugs. Wolfe points out that the drugs were not properly marked, were placed in a safe shared by nearly ten people for four days, and the weight, character, and color of the evidence had changed.

In resolving this issue, we note that when dealing with fungible evidence such as cocaine, the State must give reasonable assurances that the evidence remained in an undisturbed condition. See Whaley v. State, 843 N.E.2d 1, 7 (Ind. Ct. App. 2006) (finding cocaine as fungible evidence). The State need not establish a perfect chain of custody, and once the State "strongly suggests" the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. Troxell v. State, 778 N.E.2d 811, 814 (Ind. 2002). Police officers are presumed to exercise due care in handling their duties and a presumption of regularity exists in the handling of evidence by the officers. Id. To successfully challenge the chain of custody, a defendant "must

19

present evidence that does more than raise a mere possibility that the evidence may have been tampered with." Id.

In this case, Officer Skinner testified that after obtaining the cocaine from the C.I., he placed the drugs in a plastic bag and put the bag inside another heat-sealed bag. Tr. p. 262-63. Officer Skinner initialed the inner and outer bags and wrote the cause number on the bag and placed the sealed bag into a secure locker at the Drug Task Force. Id. at 262-63. Only investigators on the Drug Task Force knew the combination to the locker. Id. at 266-67.

It was also established that it was common practice for an officer to place newly obtained evidence into the locker. Tr. p. 267. Officer Greg Ellison, the supervisor of the Delaware County Drug Task Force at the time, testified that he first came into contact with the evidence on September 24, 2008. He then moved the evidence to the property room two days later. Id. at 347-48. According to the property record and receipt, the evidence was submitted to the Delaware County Sheriff's Department on September 22, 2008. Def's Ex. B. It appears likely that Officer Ellison simply confused the dates as to when he initially moved the evidence to the property room, especially considering that the trial happened three years after the fact.

On October 9, 2008, Officer Ellison removed the evidence from the property room and transported it to the Indiana State Police Lab in Fort Wayne. Tr. p. 348; State's Ex. 3. The lab report indicated that the evidence was sealed when it was received. State's Ex. 3. Once at the lab, the evidence tested positive for cocaine. Tr. p. 329. The chemist

20

testified that she tested the drugs and recognized the markings on it and her own markings after she sealed the evidence. Id. at 329.

On March 4, 2009, Officer Ellison returned to the Indiana State Police Lab in Fort Wayne to retrieve the evidence. Tr. p. 348. The evidence remained in the property room at the Sheriff's Department until trial. Id. It was established that the evidence was under the care of the Sheriff's Department at all times, and only law enforcement officials had access to the evidence. Id. at 349, 354. The cocaine admitted at trial still bore Officer Skinner's initials and the cause number. State's Ex. 2. Moreover, the chemist testified that the seal she applied was still in place and did not appear to be tampered with. Id. at 330.

Officer Skinner field tested the crack cocaine at a weight of 1.1 grams, while the lab found it weighed 1.07 grams. Tr. p. 330. According to Officer Ellison, .04 grams is not a "very big difference" and it was normal for the field test weight to be different than weight recorded at the laboratory. Id. at 355-56. The 0.04 gram difference was equated to a piece of hair. Id. at 355. With respect to the color of the cocaine, Officer Skinner testified that different shades of brown, yellow, and white are all classified as "off white." Tr. p. 294.

In sum, the evidence established the cocaine's whereabouts and demonstrated that the drug remained in an undisturbed condition from the time that it had been originally obtained. It is also apparent that the difference in weight and the alleged color characteristics in the drugs were so minor that they only affect the weight of the evidence

21

that could be properly resolved by the trier of fact. See, e.g., Hill v. State, 450 N.E.2d 64, 65 (Ind. 1983) (noting that contradictory evidence about defendant's height, hair color, and cap was not significant enough to preclude a jury determination of guilt). In short, the State provided assurances that the cocaine remained in an undisturbed condition and Wolfe's claims of tampering were nothing more than mere possibilities. Hence, Wolfe's chain of custody arguments amount to requests for us to reweigh the evidence, which we decline.

## IV. Plea Agreement

Finally, Wolfe argues that his conviction must be reversed because he never received a plea agreement from the State that was purportedly offered to him. Wolfe contends that because he did not know about the plea agreement, he was under the false assumption that his only option was to proceed to trial.

As discussed in the FACTS, because Wolfe was represented by counsel when the offer was made, the State directly communicated with Wolfe's counsel and not directly to him. Appellant's App. p. 186. It was not the State's obligation to ensure that Wolfe knew of the plea offer.[2] Even more compelling, the State is not under any obligation to offer a plea agreement. Therefore, we conclude that Wolfe is not entitled to a reversal on this basis.

---

[2] In fact, Wolfe claims that his trial counsel was ineffective allegedly for failing to advise him of any plea offer that the State had made. Even assuming that Wolfe's counsel had not conveyed the plea agreement to him, Wolfe must still establish by a preponderance of the evidence that counsel acted unreasonably and that, "but for counsel's actions, there was a reasonable probability that [the defendant] would have accepted the plea offer." Dew v. State, 843 N.E.2d 556, 565 (Ind. Ct. App. 2006).

The judgment of the trial court is affirmed.

ROBB, C.J., and BRADFORD, J., concur.