## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 27 2017, 9:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander L. Hoover
Law Office of Christopher G. Walter, P.C.
Nappanee, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Cedric S. Ware,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

February 27, 2017

Court of Appeals Case No.
20A03-1607-CR-1686

Appeal from the Elkhart Circuit Court

The Honorable Terry C. Shewmaker, Judge

Trial Court Cause No.
20C01-1504-F2-5

**Najam, Judge.**

# Statement of the Case

Cedric S. Ware appeals his conviction, following a jury trial, for dealing in cocaine, as a Level 2 felony; possession of a controlled substance, as a Class A misdemeanor; and possession of marijuana, as a Class B misdemeanor. He raises two issues on appeal:

1.    Whether the trial court abused its discretion when it admitted evidence obtained pursuant to the execution of a search warrant.

2.    Whether the trial court committed fundamental error when it admitted cocaine into evidence.

We affirm.

# Facts and Procedural History

In 2014, Sarah Nidiffer lived at 30850 Oakcrest Drive in Granger, Indiana. Beginning in November of that year, Niddifer lived with her son, Brock Rodman, and her boyfriend, Ware. During the time period between November 2014 and April 2015, Niddifer drove Ware to many houses at Ware's request. Niddifer saw Ware enter those homes, usually for about five or ten minutes but sometimes for up to an hour, and then return to the car. While Ware entered the homes, Niddifer remained in the car as directed by Ware. On occasion, a person from a home came out to the car instead of Ware entering the home. On those occasions, Ware passed something to the other person through the passenger-side window, and the person passed cash to Ware.

[4] On April 13, 2015, Niddifer returned home from work to find Ware visibly upset about Rodman being home. Ware asked Nidiffer when Rodman would leave the house because Ware "needed to cook." Tr. at 157-58. Nidiffer understood Ware to mean he needed to cook crack cocaine. Niddifer saw Ware heat water in a pot on the stove and place a glass mixing bowl containing a white powdery substance on top of the pot. Ware then instructed Nidiffer to tear up pieces of paper—first into strips, then into squares—which she did while Ware continued to cook the substance on the stove. Niddifer then went to bed at approximately 10:00 or 10:30 p.m. that night.

[5] When Niddifer woke up a few hours later and returned to the kitchen, she found Ware at the kitchen table, with scales, cutting up a brick of the white substance "into littler rocks." *Id*. at 160. Ware told Niddifer to go back to bed and she did so. Niddifer never saw Ware consume any of the white substance from that night, nor did she observe Ware consume cocaine at any other time.

[6] Niddifer went to work the next day, April 14, and when she returned home Ware told her that he was going to South Bend. Ware left and returned home later that night at about 11:45 p.m. Ware smoked some marijuana in his bedroom before going to bed that night.

[7] Sergeant Scott Frey ("Officer Frey") of the Elkhart County Sheriff's Department was working the midnight shift on April 14 to April 15, 2015, and sometime around 11:24 p.m. on April 14 he received an anonymous call informing the police that Ware and Nidiffer had been cooking crack cocaine at

30850 Oakcrest Drive. Because the caller was not identified, Officer Frey investigated further; he conducted a criminal history search and a background check on Ware and learned that Ware had valid felony arrest warrants with a listed address of 30850 Oakcrest Drive. Officer Frey then telephoned the master control center at the Elkhart County jail to confirm the arrest warrants for Ware and gather identifying information about Ware. Officer Frey also located a photograph of Ware through records kept by the Bureau of Motor Vehicles.

[8] Officer Frey then recruited other officers to assist his execution of the felony arrest warrants for Ware, and the officers arrived at Ware's residence at Oakcrest Drive at about 12:29 a.m. Officer Frey knocked at the front door, and Nidiffer answered. Officer Frey identified himself as a police officer and asked if Ware was home. Niddifer said Ware was not there and then tried to shut the front door. Officer Frey put his foot out to stop the door from closing and explained to Niddifer that the police had a warrant for Ware's arrest. Officer Frey then heard a noise upstairs inside the home that sounded to him like footsteps running on a wood floor, which led him to believe someone was attempting to flee the residence. Officer Frey then instructed Niddifer to move away from the door, drew his firearm, and entered the home along with the other police officers.

[9] Inside the home, Officer Frey immediately smelled the strong odor of raw and burnt marijuana. Officer Frey was very familiar with those smells from his years of police training and experience. Officer Frey located Ware upstairs in

the hallway and also located Rodman in the house. Officer Frey handcuffed Ware and read Wear, Niddifer, and Rodman their *Miranda* warnings. All three occupants acknowledged to Officer Frey that they understood the *Miranda* warnings. Officer Frey then informed the three occupants that he smelled marijuana. Ware admitted to possessing a "blunt" which is a marijuana cigarette, in his bedroom, Tr. at 130, and Rodman admitted to possessing "a small bag of weed" inside the residence, Def. Ex. TA3.

[10] Officer Frey asked Niddifer if she would consent to a search of the home, and she refused. Officer Frey then sought and obtained a search warrant for the residence. In his Affidavit for Search Warrant, Officer Frey stated that he had good cause to believe that "[c]ertain evidence involved in the commission of the offenses pertaining to Dealing in Marijuana, Possession of Marijuana, Possession of a Controlled Substance, and/or Possession of Drug Paraphernalia . . . [was] concealed in, on, or about" the residence at 30850 Oakcrest Drive, and he described that residence in detail. Officer Frey described his training and experience as a law officer in identifying controlled substances. He noted that he had arrived at Ware's residence on April 15 to execute an arrest warrant for Ware. Officer Frey then described in detail what happened when he and the other officers had gone to Ware's residence to execute the arrest warrant and noted, in particular, that, "[a]s [he] had entered the residence at 30850 Oakcrest Dr[ive], [he] immediately smelled a strong odor of raw and burnt marijuana inside the residence, which [he] identified through [his] training and experience as a law enforcement officer." *Id.* The affidavit

noted that, based on the facts contained therein, Officer Frey believed that "a search of the residence . . . will disclose the existence of: marijuana, drug paraphernalia[] used in the ingestion of a controlled substance, evidence of domicile, and any other controlled substances in any form, baggies or other types of containers, and any other indicia of the use and/or consumption." *Id.*

[11] Based on Officer Frey's affidavit, a trial court issued a Search Warrant dated April 15 authorizing the Elkhart County Sheriff's Department to enter the residence located at 30850 Oakcrest Drive and search there for "marijuana, drug paraphernalia[] used in the ingestion of a controlled substance, evidence of domicile, and any other controlled substances in any form, baggies or other types of containers, and any other indicia of the use and/or consumption; the possession of which is in violation of Code 35-48-4 *et seq.*" Def. Ex. TA1. The search warrant further ordered the officers to "seize such property or any part thereof, found on such search . . . " *Id.*

[12] Officer Frey then executed the search warrant on April 15. In doing so, he discovered inside Ware and Niddifer's bedroom a clear plastic baggie of seventeen loose yellow pills that later tested positive to be alprazolam, a small burnt marijuana cigarette in an ashtray, and 101 pieces of folded paper in two clear plastic baggies that contained what would eventually test positive for cocaine. Officer Frey knew from his training as a law enforcement officer that a common way of storing narcotics is to place them in folded pieces of paper. Officer Frey conducted a field test of the substance he found in the ashtray and it tested positive for marijuana. Officer Frey photographed all of the

contraband and took it into evidence. Officer Frey arrested Ware, and on April 16, the State charged Ware with three counts: (I) dealing cocaine, as a Level 2 felony; (II) possession of a controlled substance, as a Class A misdemeanor; and (III) possession of marijuana, as a Class B misdemeanor.

[13] On October 20, 2015, Ware filed a motion to suppress evidence discovered and gathered during the execution of the search warrant of his home. The trial court held a hearing on the motion to suppress on February 16, 2016, and it subsequently denied the motion on May 17.

[14] The court held Ware's jury trial on May 16 and May 17. Officer Frey testified that, after photographing the 101 individually wrapped packets he found in a drawer in Ware's bedroom, he placed them in an evidence bag and transported them in a secured trunk to the sheriff's department. Officer Frey then laid out each of the 101 individual packets and photgraphed them. Per the Elkhart Sheriff's Department protocol, Officer Frey then removed the off-white substances from each individually wrapped packet, combined the substances all together on a scale and weighed the substances in one lump sum. Officer Frey then photographed and field tested one sample from the "one lump sum" of the off-white substance, and it tested positive for crack cocaine. Tr. at 209. He then placed the lump sum in a plastic evidence bag, heat sealed it, initialed it, put an identifying tag on it, and placed it in an evidence locker. Officer Frey sent the lump sum to a certified laboratory for additional testing.

[15]    Sarah Wildeman, a forensic drug chemist with the Indiana State Police, testified that she did both presumptive and confirmatory tests and confirmed that the pills found in Ware's bedroom contained alprazolam and that the off-white substance collected at Ware's home contained cocaine. Wildeman testified that, when the cocaine came to her lab for testing, it was in the form of a lump sum containing "a lot of different chunks of an off-white rock-like substance," rather than 101 individual packets containing the off-white substance. *Id.* at 232. She testified that the lump sum was sealed when she received it. She tested samples of several different rocks within the lump sum but she did not remember how many different rocks she tested. She testified that the lump sum weighed 13.98 grams. Wildeman noted that she followed the normal protocol and safeguard procedures in conducting the testing of the lump sum. Wildeman further testified that it was "theoretically" possible that, out of the 101 individually wrapped packets, the off-white substance contained in ninety of the packets could have tested as a noncontrolled substance. *Id.* at 245. Wildeman also testified that, had the off-white substance been sent to her individually packaged, pursuant to laboratory protocols she would have tested each packet of the substance until she reached the weight threshold contained in the criminal charges, which in this case was ten grams.

[16]    The jury found Ware guilty on all three counts. The trial court sentenced Ware accordingly. This appeal ensued.

# Discussion and Decision

### *Issue One:  Probable Cause for Search Warrant*

[17]     Ware challenges the trial court's decision to admit the evidence obtained during the April 15, 2015, search of his home.  The admission or exclusion of evidence is entrusted to the discretion of the trial court.  *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012).

> We will reverse a trial court's decision only for an abuse of discretion.  [*Farris v. State*, 818 N.E.2d 63, 67 (Ind. Ct. App. 2004).]  We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant.  *Taylor v. State*, 891 N.E.2d 155, 158 (Ind. Ct. App. 2008).  An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law.  *Id*.  In determining whether an error in the introduction of evidence affected an appellant's substantial rights, we assess the probable impact of the evidence on the jury.  *Oldham v. State*, 779 N.E.2d 1162, 1170 (Ind. Ct. App. 2002).  Admission of evidence is harmless and is not grounds for reversal where the evidence is merely cumulative of other evidence admitted.  *Pavey v. State*, 764 N.E.2d 692, 703 (Ind. Ct. App. 2002).

*Id*.

[18]     In the context of a motion to suppress evidence due to an alleged lack of probable cause underlying a search warrant, we must determine whether the judge who issued the search warrant had a substantial basis for concluding that probable cause existed.

In deciding whether to issue a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). The duty of the reviewing court is to determine whether the magistrate had a "substantial basis" for concluding that probable cause existed. *Id*. at 238-39, 103 S. Ct. 2317. It is clear that a substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause. *Houser v. State*, 678 N.E.2d 95, 99 (Ind. 1997). A "reviewing court" for these purposes includes both the trial court ruling on a motion to suppress and an appellate court reviewing that decision. *Id*. at 98.

*Query v. State*, 745 N.E.2d 769, 771 (Ind. 2001).

[19] Ware first asserts that the April 15 search of his home was in violation of the Fourth Amendment to the United States Constitution[1] because the search warrant was based on an affidavit that failed to state facts showing probable cause for the search. Therefore, Ware concludes, the trial court abused its discretion in denying his motion to suppress the evidence obtained from that search.

---

[1] Ware also professes to raise a claim under Article 1, Section 11 of the Indiana Constitution. However, because Ware presents no authority or independent analysis supporting a separate standard under the state constitution, that claim is waived. *See, e.g.*, *Henderson v. State*, 769 N.E.2d 172, 175 n.6 (Ind. 2002).

The Fourth Amendment to the United States Constitution requires that search warrants be supported by probable cause. *See Combs v. State*, 895 N.E.2d 1252, 1255 (Ind. Ct. App. 2008), *trans. denied*. Probable cause to search exists "where the facts and circumstances within the knowledge of the officer making the search, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *State v. Hawkins*, 766 N.E.2d 749, 751 (Ind. Ct. App. 2002), *trans. denied*. The affidavit requesting a search warrant must "particularly describe" the house or place to be searched and the things to be searched for, and it must "allege[] substantially" the offense in relation to the place and things searched. Ind. Code § 35-33-5-2(a) (2015). The affidavit must also "set[] forth the facts known to the affiant through personal knowledge . . . , constituting the probable cause." *Id*. The determination of whether probable cause exits "is to be based on the factual and practical considerations of everyday life upon which reasonable prudent persons act." *Hawkins*, 766 N.E.2d at 751.

Officer Frey's affidavit for a search warrant stated that he had good cause to believe he would find "evidence relevant to the offenses of" dealing marijuana and possession of marijuana, possession of a controlled substance, and/or possession of drug paraphernalia at Ware's residence.[2] Def. Ex. TA3. In support of this belief, he cited his experience and training as a law enforcement

---

[2] Ware does not dispute that there was probable cause to believe 30850 Oakcrest was his residence.

officer in identifying controlled substances[3] and the fact that he had smelled raw and burnt marijuana upon entering Ware's residence.[4] He also cited the facts that Ware and Rodman admitted to him, after being given and acknowledging understanding of *Miranda* warnings, that they had small amounts of marijuana in the house. Those factual statements, made from Officer Frey's own first-hand knowledge, are sufficient to support a finding of probable cause to search the house for evidence of possession of marijuana. *See Johnson v. United States*, 333 U.S. 10, 13 (1948) (noting that, if the presence of odor is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, it might be found to justify issuance of a search warrant); *Minnick v. State*, 544 N.E.2d 471, 477 (Ind. 1989) (holding that, when the defendant knowingly waived his *Miranda* rights, any custodial statement he made after waiver could properly be used to obtain a search warrant). Therefore, the trial court did not abuse its discretion in admitting evidence of the marijuana found pursuant to the valid search.

---

[3] Ware does not challenge Officer Frey's ability to recognize illegal drugs from his training and experience as a law enforcement officer.

[4] Ware does not challenge Officer Frey's initial entry into his home and, indeed, Officer Frey had authority to enter what he knew to be Ware's residence to execute the valid felony arrest warrants for Ware at a time when Ware was likely to be at home, i.e., 12:30 a.m. *See Carpenter v. State*, 974 N.E.2d 569, 572-74 (Ind. Ct. App. 2012), *trans. denied*; *see also*, I.C. § 35-33-2-3(b) (providing that a "law enforcement officer may break open any outer or inner door or window in order to execute an arrest warrant, if he is not admitted following an announcement of his authority and purpose").

[22] However, Ware contends that the search was unconstitutional because the affidavit for the search warrant contained the "false and misleading statements" that Officer Frey had good cause to believe he would find evidence of *dealing*, as opposed to merely possessing, marijuana or other controlled substances.[5] Appellant's Br. at 11. In support, he cites this court's opinion in *Buford v. State*, 40 N.E.3d 911 (Ind. Ct. App. 2015). But *Buford* involved an affidavit that *only* alleged evidence of drug *dealing*, and the affidavit only provided evidence of a small amount of marijuana, which the court noted did not support probable cause for dealing—as opposed to possessing—drugs. *Id.* at 915 n.7. Here, on the other hand, Officer Frey's affidavit alleges evidence of dealing and possessing illegal drugs and, in support, cites evidence of small amounts of marijuana located in Ware's residence. While that evidence would not be sufficient to show probable cause for dealing alone, it did provide a sufficient showing of probable cause to believe Ware possessed marijuana. Thus, unlike in *Buford*, even if the language relating to dealing were excised from the affidavit, there would still remain probable cause to search Ware's home for marijuana.

[23] Moreover, the cocaine and alprazolam were also admissible even though the affidavit for search warrant did not contain facts showing probable cause to believe any drugs other than marijuana would be found in Ware's residence.

---

[5] We disregard Ware's statement that the search warrant was based on "an uncorroborated anonymous tip," Appellant's Br. at 11, as Ware subsequently admits that the affidavit for search warrant did not mention the anonymous tip and that the issue of hearsay was therefore not "in play," *id.* at 13.

Police may seize contraband discovered pursuant to a valid search warrant, so long as the contraband is in plain view in places within the scope of the search warrant and the contraband's illegal nature is readily apparent. *See, e.g.*, *Granger v. State*, 946 N.E.2d 1209, 1214 (Ind. Ct. App. 2011) (citing *Jones v. State*, 783 N.E.2d 1132, 1137 (Ind. 2003)). Here, the police were authorized under the Fourth Amendment to search anywhere in Ware's home where they were likely to find marijuana. In the course of that valid search, they discovered seventeen loose alprazolam pills and 101 pieces of folded paper containing cocaine in Ware's bedroom, the incriminating nature of which Officer Frey immediately recognized from his training as a law enforcement officer. Therefore, the trial court did not abuse it's discretion in admitting evidence of the alprazolam and the cocaine.

## Issue Two: Chain of Custody of Cocaine

[24] Ware also contends that the trial court erred in admitting the cocaine contained in State's Exhibit 15 and the results of the laboratory analysis of that cocaine contained in State's Exhibit 21 because the State failed to show a sufficient chain of custody for the cocaine. However, Ware acknowledges that he did not object to the admission of those exhibits on the grounds that the State had failed to show a sufficient chain of custody.[6]

---

[6] "A mere general objection, or an objection on grounds other than those raised on appeal, is ineffective to preserve an issue for appellate review." *Raess v. Doescher*, 883 N.E.2d 790, 797 (Ind. 2008). Ware admits that his objection to the admission of State's Exhibits 15 and 21 was based solely on his claim that the exhibits should be excluded due to the illegality of the search. Appellant's Br. at 20.

[25]    When a defendant fails to make a contemporaneous objection at the time the evidence is introduced at trial, he waives the right to appeal the admission of that evidence unless the trial court committed fundamental error. *E.g.*, *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Fundamental error is a substantial, blatant violation of due process that must be so prejudicial to the rights of a defendant as to make a fair trial impossible. *Id.* When we evaluate the issue of fundamental error, we must

> look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible.

*Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (emphasis original).

[26]    Ware asserts that the trial court committed fundamental error when it admitted State's Exhibits 15 and 21 because the State failed to show that it kept the cocaine in an "undisturbed condition" as required to show a sufficient chain of custody. Appellant's Br. at 18. In particular, Ware asserts that Officer Frey "disturbed" the evidence when he removed the rock-like substances from the 101 individual packets and placed them all into one lump sum for testing. *Id.* He contends, in essence, that that "disturbance" resulted in a lack of evidence of how much "adulterated" cocaine he possessed because the laboratory tested only a few samples from the lump sum rather than the substance in each individual packet. *Id.* at 20.

[27]    In order to establish a sufficient chain of custody,

> the proponent of fungible evidence need only provide evidence
> that strongly suggests the whereabouts of the evidence at all
> times. *Russell v. State* (1986), Ind., 489 N.E.2d 955. Reasonable
> assurances must be provided that the evidence passed through
> various hands in an undisturbed condition. *Id*. A defense
> argument which merely raises the possibility of tampering does
> not make the chain of custody inadequate. *Id*.

*Reynolds/Herr v. State*, 582 N.E.2d 833, 837 (Ind. Ct. App. 2011). Furthermore, where an exhibit's chain of custody is in question but there is no evidence of any tampering, there is a presumption that a system of regularity accompanied the handling of the evidence if the exhibit was at all times within official custody. *Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002).

[28]    Here, the evidence shows a sufficient chain of custody of the cocaine. Officer Frey testified that he was the officer who found the cocaine in Ware's home, transported it to the sheriff's department, placed it all into one lump sum, weighed it, field tested it, sealed it, and sent it to the laboratory. Wildeman testified that she received that evidence in a sealed and undisturbed condition before testing it herself. Thus, the evidence establishes that the cocaine was at all times within official custody and was, thus, presumptively handled with a system of regularity. *Id*.

[29]    Ware does not point to any other evidence of tampering. Nor does Ware contest that the evidence shows that normal laboratory procedures were

followed in testing the representative sample of the lump sum.[7]  And Ware is incorrect to the extent he suggests that the testing of a representative sample of the total amount of the cocaine, alone, shows a "disturbance" in the chain of custody, tampering, or invalid laboratory testing.  Our supreme court has determined that, with respect to the weight element of the offense of dealing cocaine, the total weight of the drug, and not merely its pure component, is to be considered.  *Woodford v. State*, 752 N.E.2d 1278, 1283 (Ind. 2001); *see also Evans v. State*, 566 N.E.2d 1037, 1042 (Ind. Ct. App. 1991).  Thus, the State was not required to test the substance in each individual packet when the packets were found together, were similar in appearance and were wrapped in the same manner.

[30]  Because Ware does not point to any evidence that the chain of custody of the cocaine was insufficient, the trial court did not commit fundamental error when it admitted State's Exhibits 15 and 21.

## Conclusion

[31]  The trial court did not abuse its discretion in admitting the evidence obtained as a result of the April 15 search of Ware's home, as that search was based on probable cause.  And the trial court did not commit fundamental error when it

---

[7]  To the extent Ware relies on Wildeman's testimony that it was theoretically possible that ninety of the 101 packets could have been noncontrolled substances, Ware's argument is based on speculation, which we will not consider.  *Reynolds/Herr*, 582 N.E.2d at 837.

admitted evidence of the cocaine, as the State showed a sufficient chain of custody for that evidence.

[32] Affirmed.

Bailey, J., and May, J., concur.